STATE OF NEBRASKA, BOARD OF EDUCATIONAL LANDS AND FUNDS, APPELLANT, V. LYDIA JARCHOW AND WAYNE JARCHOW ET AL., APPELLEES.

362 N.W.2d 19

Filed January 25, 1985.    No. 83-615.

Paul L. Douglas, Attorney General, and Ruth Anne E. Galter, and, on brief, Frank J. Hutfless, for appellant.

Steven C. Smith of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellees Jarchow.

No appearance for appellees C. LeRoy Irey et al.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, CAPORALE, and SHANAHAN, JJ., and COLWELL, D.J., Retired.

HASTINGS, J.
This was an action brought by the plaintiff under the provisions of Neb. Rev. Stat. § 34-301 (Reissue 1984) to

ascertain and establish boundary corners common to Sections 15, 16, 17, 20, 21, and 22, Township 16 North, Range 45 West of the 6th P.M., Garden County, Nebraska.

From a finding and order generally against the plaintiff, the plaintiff has appealed. It assigns as error that the "findings and verdict by the district court are contrary to law and the evidence."

For the purpose of this appeal we need concern ourselves only with Section 16, record title to which is in the plaintiff, and the north half of Section 21, which is owned by the Jarchows. Section 16, of course, lies immediately north of Section 21.

A dispute arose as to the location of the boundary common to Sections 16 and 21. Section 34-301 provides generally that whenever one or more owners of land, the corners and boundaries of which are lost, destroyed, or in dispute, desire to have the same established, they may bring an action in the district court to have them ascertained and permanently established. The case is tried as an equity case and reviewed here de novo on the record.

Two land surveys directly relating to these properties were received in evidence. One was an August 8, 1975, survey executed by Willis L. Brown, a state surveyor acting under instructions of the Board of Educational Lands and Funds of the State of Nebraska. The other was one prepared on July 13, 1976, by William E. Keefover, a former Garden County surveyor, at the request of John Jarchow, now deceased. Two other somewhat related surveys appear in the record, which will be referred to later on in this opinion.

None of the original government survey corners were found for Sections 16 and 21. Neb. Rev. Stat. § 23-1908 (Reissue 1983) provides in pertinent part as follows:

> The boundaries of the public lands established by the duly appointed government surveyors, when approved by the Surveyor General and accepted by the government, are . . . held and considered as the true corners . . . and the restoration of lines and corners of said surveys and the division of sections into their legal subdivisions shall be in accordance with the laws of the United States, [and] the circular of instructions of the United States Department

of the Interior, Bureau of Land Management, on the restoration of lost and obliterated section corners and quarter corners . . . .

Both parties agree that exhibit 6, which is Chapter V: *Restoration of Lost or Obliterated Corners*, of the Manual of Instructions for the Survey of the Public Lands of the United States 1973, contains the instructions which must be followed in a case such as this.

At this point it is necessary to set forth several applicable rules, which have been paraphrased from the manual.

5-1

In restoring the lines of a survey, the purpose is not to correct the original survey, but to determine where the corner was established in the beginning.

5-5

An existent corner is one whose position can be located by an acceptable supplemental survey record, physical evidence, or *testimony* of one or more witnesses who have a dependable knowledge of the original location.

5-9

An obliterated corner's location may be recovered if proven beyond a reasonable doubt by acts and testimony of interested landowners. A position that depends upon the use of collateral evidence can be accepted only as duly supported through relation to known corners, natural objects, or *unquestionable testimony*.

5-10

A corner is not considered lost if its position can be recovered satisfactorily by means of the testimony and acts of witnesses having *positive knowledge* of the *precise* location of the original monument.

5-11

Where the testimony of individuals is utilized, such evidence must be tested by relating it to known original corners and other calls of the original field notes. The surveyor must show in the report of survey the weight given testimonial evidence, demonstrating that the witness was duly qualified and had firsthand knowledge and whose testimony was not based on hearsay or personal opinion. The testimony should stand an

appropriate test of its bona fide character, and it must be sufficiently accurate for what is required in normal surveying practice.

### 5-13

The surveyor's work is technical in character, and such surveyor is not qualified to act judicially upon the equities or inequities that may appear.

## THE RESTORATION OF LOST CORNERS
### 5-20

A lost corner is a point of a survey that cannot be determined *beyond a reasonable doubt* from *acceptable* evidence or testimony concerning the original position, and whose location can be restored only by reference to one or more interdependent corners.

### 5-21

The rules for restoration of lost corners should not be employed until all original and collateral evidence has been developed. The surveyor will then turn to proportionate measurement, which is always employed to relocate a lost corner unless outweighed by *conclusive* evidence of the original survey.

### 5-24

Proportionate measurement is one that gives equal weight to all parts of the line. The excess or deficiency between two existent corners is so distributed that the amount given to each interval bears the same proportion to the whole difference as the record length of the interval bears to the whole record distance. After the proportionate difference is added to or subtracted from the record length of each interval, the sum of the several parts will equal the new measurement of the whole distance.

At the outset it should be pointed out that this particular township, as reflected by the original government plat, contained short sections along both the north and west boundaries. For our purposes it is important to note that the north "80s" of Section 4, on a line north of Sections 16 and 21, contained but 69.66 and 70.87 acres. This, of course, would translate into a north-south township dimension of something

less than a full 31,680 feet (6 miles).

According to the field notes of the Brown survey, the corners involved were originally marked with pits and mounds. Some of these corners had been perpetuated by county surveyors using materials other than that used by the original surveyor. Where no evidence of the original position of a corner could be found, it was considered to be a lost corner and was reestablished by proportionate measurement based upon the original plat and field notes. There was no recitation of the efforts made to find the original corner markers.

The Brown survey utilized five perpetuated corners, indicated by permanent monuments or markers. Two of those corners were located along the south line of the township, 4 miles apart; two located along the north line, 6 miles apart; and one located along the midline, 3 miles to the east of the east line of Section 16. These five "found" permanent markers were located within 3 to 5 miles of the nearest border of Section 16.

From those permanent markers 15 intermediate section corners and quarter corners were established, including the 8 surrounding Section 16. Checks were made on the established markers by closing on each other or on the permanent markers, as shown by the original government plat. The Brown survey employed but one piece of collateral evidence, that being a previous survey of Section 15, performed in August of 1941 by W.F. Chaloupka, the then deputy county surveyor of Garden County.

The Brown survey verified the location of Chaloupka's northwest corner of Section 15 as being within 2 feet east to west. However, the north-south positioning was rejected because "[h]e has set the corners at record distance from the south boundary. This would make a deficiency of 203 feet in the north half-mile along the north tier of sections. We have given each mile its proportionate share of deficiency. (2,621.52 ft. resurvey = 2,640 ft. original)" This would result in an assigned deficiency of 36.96 feet for each section.

The entire north-south dimension of the township was actually measured by Brown to be 31,341 feet and by Chaloupka to be 31,351 feet. This is an average of 31,346 feet, and when compared to the standard dimension of a full

township would amount to a deficiency of 334 feet. Considering the fact that the northern tier of sections, with their 70-acre "80s," would be approximately 150 feet short, there is still a discrepancy of 184 feet to be accounted for. Brown assigned that shortage to the lower five tiers of sections, in the amount of approximately 37 feet each. Chaloupka arbitrarily relegated the entire shortage to the upper tier of sections. This would more or less verify the position taken by Brown that the corner common to Sections 9, 10, 15, and 16 established by Chaloupka was some 198 feet too far north.

Both surveys were accomplished by utilizing the same five perpetuated corners. However, Chaloupka apparently made no effort to close those corners on each other or to otherwise verify his measurements. On the other hand, Brown's checks, previously mentioned, together with the calculated verification above, would seem to lend credulity to the latter survey.

Both Brown and Chaloupka ran lines from one common point. This was the perpetuated corner of Sections 13, 18, 19, and 24, Township 16 North, Ranges 44 and 45 West, set by Chaloupka in 1941. This point may otherwise be described as the midline of the township, 3 miles east of the east line of Section 16. This point, according to the field notes of Brown and as seems to appear from the plat of Chaloupka, should be on a line with the south boundary of Sections 15 and 16. However, this line actually appears in the Chaloupka survey to be considerably north of the line established by Brown, which latter line we have concluded to be more reliable.

Another survey considered and rejected by Brown was a 1970 survey of Sections 22 and 27. The northwest corner of Section 22 is common to the southeast corner of Section 16. This survey was conducted by Keefover, with the owners apparently *agreeing* as to the location of a road, and with the use of local evidence. Because there is no such agreement or desire indicated here by the owners of Sections 16 and 21, that survey was disregarded, and properly so.

Finally, we consider the 1976 Keefover survey which was relied on by the trial court in entering judgment. A portion of the certification statement from that survey fairly characterizes its conclusions.

Having previously surveyed in this general area . . . and talked to several early residents, and County grader operator, who knew some of the area before road grading, and while more fences were in place, it is my conclusion that local evidence of the old corners, (proportioning intervals of a couple of miles or so), is the only method that will fit anything that exists. While it seems evident that there was some carelessness with the lines when the roads were graded, most of the early residents think that for the most part the roads are about where they belong, have been graded along old fences, or just graded about where the old trails had been traveled. Proportioning long distances, (clear across the township, and between proportionally re-established corners on the Township and Range lines, will put corners and lines in confusion, and where about everyone knows the old corners had not been.

There are no field notes in the record, and from what can be concluded or from the plat of survey, no attempt was made to close measurements and the established corners with any perpetuated corners. There is a note on the plat at the northwest corner of Section 16, as established by the survey, that John Jarchow reports being with W.F. Chaloupka when he found brick and charcoal by a fence some distance north of the fence corner, and a recollection that a trail existed south of a fence. The plat also discloses a $1/2$-inch rod found at a fence corner which the Chaloupka survey apparently assumed to be the northwest corner of what would be Section 9. Reference is also made to a portion of an old, buried fence which is located near the south line of Section 16 as established by Keefover.

Keefover's testimony sheds little additional light on the problem. He said he was present when an attempt was made with a road grader to uncover the alleged brick and charcoal at the claimed northwest corner of Section 16. It was not found.

The procedure for locating the northwest corner of Section 21 was interesting. Keefover testified that "well, what I marked for the northwest corner of 21 and then, of course, measuring on through the school section taking into account conversations with several different people, that is, you know, you can hear

testimony and people tell you what they remember." When asked if that was a standard practice in surveying, he replied:

> Oh, yes, if you have an old timer but sometimes you get a conflicting information, not that they are lying about it, it is just the way they see it and so the surveyor in judgment has to take what he heard and relate it to what he can otherwise find and see what is in the record.

The 1/2-inch rod previously referred to as located at the northwest corner of Section 9 was explained by Keefover as follows:

> Well, after a lot of work and measuring, I accepted fence corners as the best evidence of the original corner and you can see from the map that we went until we found a half inch rebar *which I don't know how it got there* but it was at a fence corner two miles north and working clear on down to a corner power pole which is also a fence corner at the south side of what is being used as the south side of Section 21 and relating those measurements to what I consider very reasonable inconsistent variance that I find all the time between what is on the ground and what the original survey calls for.

(Emphasis supplied.)

One of the problems with that explanation is that there is no showing of what measurements were related to what other established points in order to verify the same. Interestingly enough, his testimony, and the plat of survey as well, reveals that Section 16 was measured as 5,139.5 feet on the west side and 5,363.2 feet on the east side. On the other hand, the Chaloupka survey apparently arbitrarily assigned distances of 5,280 feet to each side, whereas Brown measured these distances as 5,243.04 and 5,245.68 feet respectively.

It was asserted by Keefover that his points fit the roads and trail roads and fences, which he concluded conformed to accepted surveying standards. However, Keefover admitted that almost everyone to whom he talked told him that the roads were way off. These apparently included the witnesses who furnished him his local evidence, and they were not placed under oath. Keefover did not know most of the people to whom he talked, but he *thought* they lived in the area.

In support of the Keefover survey there was testimony by Ernest Irey, a resident of the area, that he had seen a limestone rock that had been uncovered by Chaloupka. It was located on the extended trail road along what he considered to be the line between Sections 16 and 21, at a point in the road between Sections 14 and 15. This point would be at the southeast corner of Section 15. He said he understood that Chaloupka had reburied the stone and driven an iron rod next to it. Jarchows apparently would have us draw the inference that this was a permanent marker *found* by Chaloupka when he surveyed Section 15. However, reference to Chaloupka's plat would indicate a rock and pipe *placed* by Chaloupka to establish the southeast corner of Section 15. In any event, Keefover had previously testified that he did not use nor look for Chaloupka's corners. He also apparently failed to find any of the corners which he himself had placed in his survey of Section 22, previously referred to in this opinion.

With reference as to what use he made of his own 1970 survey of Section 22, Keefover's testimony was equivocal. At one point it would suggest that he did not find any of those corners. At another point reference was made to a gear top axle that had been found and accepted as the northeast corner of Section 22. Keefover utilized that corner to set the other three corners of that section. In the survey of Sections 16 and 21, Keefover used the northwest corner of Section 22 to establish the southeast corner of Section 16. Therefore, any error in the location of the "gear top axle" corner would manifest itself in locating these other corners.

That 1970 survey had been rejected by Brown as being without a sound basis. Additionally, in the portion of the 1970 survey containing the certification, Keefover recited: "Gear top shaft was found for the NE corner, and used, although appears maybe *too far North*. North line distance checks shorter, did not find further markers, but owners desired to use the roads." (Emphasis supplied.)

The basic issue in this case is whether to accept the Brown survey or the Keefover survey. Preliminarily, then, we must decide whether we are dealing with an obliterated corner or with a lost corner.

An obliterated corner's location may be recovered by reference to acceptable supplemental survey records, physical evidence, or testimony of witnesses having a dependable knowledge of such corner's location. However, that location must be proven beyond a reasonable doubt, and, if based on testimony, it must come from witnesses having positive knowledge of the precise location of the original monument. Testimonial evidence must be tested by relating it to known original corners or other calls of the original field notes.

We believe that it is apparent from our rather laborious discussion of the facts that the Keefover survey falls far short of those standards. The so-called existent or established points utilized by Keefover were all discredited. Chaloupka's north-south positioning of the corners around Section 15 was set at record distances from the south boundary of the township. This placed the north-south boundaries too far north. The gear top axle at the northeast corner of Section 22 was, according to Keefover's own admission, too far north. Keefover made no attempt to tie his corners into any known perpetuated corners from the original government survey, the integrity of which was unquestioned.

The testimony of witnesses upon which Keefover relied could hardly be classified as testimony. Neb. Rev. Stat. § 23-1903 (Reissue 1983) suggests that a county surveyor, in the performance of his official duties, may compel the attendance of witnesses, whose testimony must be reduced to writing and subscribed by such witnesses. According to the manual, the testimony of any witnesses shall be based on firsthand knowledge, not hearsay, and it should not be merely personal opinion.

In Keefover's own certification he concludes that proportionment will put corners and lines in confusion and where about everyone knows the old corners had not been. However, we must again refer to the manual, wherein it is stated that a surveyor is not a referee as to the justice or injustice of a situation, nor is he qualified to act upon the equities or inequities that may appear to be involved.

Having concluded that there is no conclusive evidence of the original survey regarding the boundaries of Sections 16 and 21,

the manual requires the employment of proportionate measurement. As our previous review of the facts revealed, the Brown survey was conducted in that manner, and his established corners were correlated completely with the five perpetuated markers of the original government survey. In our opinion, that survey properly establishes the boundaries of the affected sections as required by law, and is adopted as the basis for our judgment.

One other issue remains. Jarchows contend that the decision of the trial court must be affirmed for the reason that the State of Nebraska is estopped by laches to determine the correct boundary between Sections 16 and 21. However, we believe that question has been answered by *State v. Platte Valley Public Power and Irrigation District*, 143 Neb. 661, 664, 10 N.W.2d 631, 633 (1943):

> Also we have held that the state as trustee is without power through legislative means or otherwise to bestow a special benefit upon any person or corporation, public or private, at the expense of the *cestui que trust*, the public school system of the state.
>
> . . . .
>
> The general rule is that the doctrine of laches cannot be applied against public rights. In other words laches is not available against the government or state, in a suit by it to enforce a public right, or to protect a public interest.

As stated in *State v. Cooley*, 156 Neb. 330, 337, 56 N.W.2d 129, 133 (1952): " 'The school lands were received and are held in trust by the State of Nebraska for educational purposes. The state as trustee . . . is required to administer the trust estate under the rules of law applicable to trustees acting in a fiduciary capacity. . . .' "

Quite apart from the doctrine of governmental immunity, the " ' "objection of laches is not tenable to defeat an equity cause, where there has been no material change in defendant's position . . . ." ' " *Fulk v. School District*, 155 Neb. 630, 645, 53 N.W.2d 56, 64 (1952). There is no evidence in this case of such a material change.

The judgment of the district court is reversed, and the cause is remanded with directions to establish the boundaries of

Sections 16 and 21 in accordance with the Brown survey.

REVERSED AND REMANDED WITH DIRECTIONS.

WHITE, J., not participating.