NATIONAL PARKS AND CONSERVA-
TION ASSOCIATION, Petitioner,

v.

BOARD OF STATE LANDS and Patrick
D. Spurgin as Director, Division of State
Lands and Forestry, State of Utah, Re-
spondents.

Garfield County, a political subdivision
of the State of Utah, Intervenor.

No. 880022.

Supreme Court of Utah.

June 24, 1993.

Rehearing Denied March 26, 1994.

Wayne G. Petty, Chris Wangsgard, William J. Lockhart, Salt Lake City, for petitioner, National Parks and Conservation Ass'n.

R. Paul Van Dam, Atty. Gen., Fred G. Nelson, David S. Christensen, Asst. Attys. Gen., Salt Lake City, for respondents.

Michael D. Hughes, Ronald W. Thompson, Barbara G. Hjelle, Wallace A. Lee, St. George, and Patrick B. Nolan, Logan, for intervenor, Garfield County.

R. Paul Van Dam, Atty. Gen., Linda Luinstra–Baldwin, John S. McAllister, William T. Evans, Asst. Attys. Gen., Salt Lake City, and Robert D. Barclay, Logan, for amici Dept. of Social Services, State Bd. of Educ., University of Utah, Utah State University.

STEWART, Justice:

National Parks and Conservation Association (NPCA) appeals from an order denying its petition for intervention and from nine administrative declaratory rulings issued by the Division of State Lands and Forestry (Division) in connection with the Division's decision to exchange a section of state school trust land for lands owned by Garfield County. NPCA contends that the Division's declaratory rulings and the order denying intervention were erroneous and that the patent conveying the school land section to the County should be rescinded.

The school trust land at issue is section 16, T34S, R8E, SLB & M, which lies within the boundaries of Capitol Reef National Park. The State of Utah acquired section 16 from the federal government pursuant to the Utah Enabling Act, which provided that the state was to receive at statehood four sections in every township "for the support of common schools." Act of July 16, 1894, ch. 138, 28 Stat. 107, § 6, *reprinted in* 1A Utah Code Annotated. The Utah Constitution provides that lands conveyed to the state pursuant to the Enabling Act "shall be held in trust for the people ... for the respective purposes for which they have been or may be granted." Utah Const. art. XX, § 1.

Garfield County applied to the Division to exchange county land for section 16 pursuant to Utah Code Ann. § 65–1–70 (1986) (currently codified at Utah Code Ann. § 65A–7–7 (Supp.1992)). The County wanted to acquire section 16 so that it could pave part of a dirt road known as the Burr Trail to improve public access to the resplendent scenery of the area. In support of its application, the County submitted appraisals of section 16 and the County lands offered in exchange. The Division relied on those appraisals in deciding to make the exchange.

The proposed exchange was processed through the State Planning Coordinator and the Areawide Clearinghouse pursuant to a notice of state action dated July 8, 1987, with comments due August 17, 1987. The proposed exchange was also submitted to the Resource Development and Coordinating Committee, which receives comments from state agencies and the public on state actions affecting the state's environmental and physical resources. *See* Utah Code Ann. §§ 63–28a–1 to –7 (1989). NPCA and others submitted comments on the proposed land exchange.

On September 4, 1987, the Board of State Lands (Board) disseminated to the media and those on a standing mailing list an agenda for the September 11 meeting in which the proposed land exchange was to be discussed. *See* Utah Code Ann. § 52–4–6(3) (1992). At the meeting, the Division presented a detailed study of the proposed exchange that analyzed the land appraisals, the economic potential of the lands, the state's trust duties in exchanging school trust land, and a memorandum of understanding (MOU) between Governor Bangerter and Secretary of the Interior Hodel regarding the exchange of federal land for state school land sections located within national parks. The Division presented five options to the Board with respect to the land exchange. Following the Division's presentation, representatives of the National Park Service and the Wilderness Society spoke in opposition to the exchange; a representative of NPCA spoke and submitted a letter to the Board setting forth procedural and substantive objections to the exchange; and a member of the Garfield County Commission urged the Board to approve the exchange. After considering the comments, the Board voted unanimously to

approve the exchange "as to concept," subject to the County's offering land of greater value.

Pursuant to a Board directive, the Division reviewed the appraisals of the land offered by the County and concluded that the value of that land was insufficient. The County then offered additional land located in the Richfield City Industrial Park. Together, the appraised value of the lands offered by Garfield County exceeded 150% of the appraised value of section 16.

On October 14, 1987, NPCA filed a petition to intervene in the land exchange proceedings and requested that the Division render declaratory rulings on nine legal issues concerning the exchange. On November 16, 1987, the Division's Director denied NPCA's petition to intervene. On December 21, 1987, the Director responded to NPCA's request for declaratory rulings by answering three of the requests and refusing to respond to the other six. He also formally approved specific terms for the land exchange. On December 24, 1987, the governor executed a patent conveying section 16 to Garfield County. NPCA filed a writ of review with this Court, challenging the Director's rulings.

This case presents five issues: (1) Does this Court have jurisdiction to review the denial of the petition to intervene and the declaratory rulings? (2) Does NPCA have standing to pursue this writ of review? (3) Did the Board and the Division, in approving the land exchange, comply with the fiduciary duties imposed by the school land trust? (4) Should the Board and Division have given priority to scenic, aesthetic, or recreational values over monetary values in approving the exchange? (5) Did the Division breach its fiduciary duties in relying solely on land appraisals submitted by the County in determining the value of the lands exchanged?

## I. JURISDICTION

■ The Division contends that this Court lacks jurisdiction to conduct this review. To support its contention, the Division relies on Utah Code Ann. § 78–2–2(3)(e)(iii), which provides that the Supreme Court has appellate jurisdiction over "final orders and decrees in formal adjudicative proceedings originating with ... the Board of State Lands." *See also* 1988 Utah Laws ch. 248, § 5. The Division argues that its approval of the land exchange was not a "formal adjudicative proceeding" and that the conveyance of section 16 to Garfield County does not constitute a final order or decree within the meaning of § 78–2–2(3)(e)(iii). If that statutory provision governed this case, the Division would be correct and this Court would not have jurisdiction. That section, however, does not govern here because it was not in effect when NPCA filed this writ of review. By its terms, § 78–2–2(3)(e)(iii) did not take effect until April 25, 1988, after the petition for review was filed.

■ As a general rule, amendments to statutes are not retroactive. Utah Code Ann. § 68–3–3. Amendments to procedural statutes may apply to pending cases, however, if the amendments merely regulate the procedures for presenting and resolving a case and do not adversely affect vested rights. *Department of Social Servs. v. Higgs*, 656 P.2d 998, 1000–01 (Utah 1982). Once a court has acquired jurisdiction of a case, jurisdiction is not extinguished by subsequent legislative action. *See Industrial Comm'n v. Agee*, 56 Utah 63, 189 P. 414 (1920). It follows that § 78–2–2(3)(e)(iii) did not divest this Court of jurisdiction over this case because jurisdiction attached under the statute in effect when the petition for review was filed.

Under the statute in effect, this Court's jurisdiction was not limited to orders issued in formal adjudicative proceedings, but extended to all final orders and decrees issued by the Board of State Lands. Utah Code Ann. § 78–2–2 (1987). Although § 78–2–2 referred only to the Board of State Lands and not to the Division, cases arising from an order of the Division were also reviewable by this Court. *Adkins v. Division of State Lands*, 719 P.2d 524, 527 (Utah 1986).

The Division's declaratory rulings were final orders under § 78–2–2. By statutory directive, declaratory rulings were reviewable by this Court because they "have the same status as agency decisions in cases disposed of by the agency after hearing."

§ 63–46a–15 (1987); *see also City of Des Moines v. Public Employment Relations Bd.*, 275 N.W.2d 753, 758 (Iowa 1979).

The Director's order denying NPCA's petition to intervene was also a final order. *See Millard County v. State Tax Comm'n*, 823 P.2d 459 (Utah 1991). NPCA filed its petition to intervene in the land exchange proceeding because it believed that its interests would be adversely affected by Division action approving the exchange application. The Director's ruling that there was no legal basis for NPCA's petition to intervene was a final, dispositive ruling on NPCA's claimed right.

## II. STANDING

Standing is a flexible legal concept designed to preserve the integrity of judicial adjudication by requiring that legal issues be adequately defined and crystallized so that judicial procedures focus on specific, well-defined legal and factual issues. To that end, the parties must have both a sufficient interest in the subject matter of the dispute and a sufficient adverseness so that the issues can be properly explored. *See Terracor v. Utah Bd. of State Lands*, 716 P.2d 796, 798 (Utah 1986); *see also Society of Professional Journalists v. Bullock*, 743 P.2d 1166, 1170 (Utah 1987); *Kennecott Corp. v. Salt Lake County*, 702 P.2d 451, 454 (Utah 1985); *Jenkins v. Swan*, 675 P.2d 1145, 1148 (Utah 1983). A plaintiff may establish standing under one of three general rules.

The first and most widely employed standard requires a plaintiff to show some distinct and palpable injury that gives rise to a personal stake in the outcome of the dispute. Whether a plaintiff has the requisite personal stake to challenge a governmental action turns on (1) the existence of an adverse impact on the plaintiff's rights, (2) a causal relationship between the governmental action that is challenged and the adverse impact on the plaintiff's rights, and (3) the likelihood that the relief requested will redress the injury claimed. *Society of Professional Journalists*, 743 P.2d at 1172–73. In most cases, this standard is so clearly met that the issue of standing is not raised.

If a plaintiff cannot meet the first standard, standing may still be established for important "public issues" if "no one else has a greater interest in the outcome[,] the issues are unlikely to be raised at all unless that particular plaintiff has standing to raise the issues," *Terracor*, 716 P.2d at 799, and the legal issues are sufficiently crystallized to be subject to judicial resolution. The rationale underlying this standard is that important issues regarding the lawfulness of governmental action ought to be judicially resolved if they can be presented by one having the necessary adverseness.

Finally, a plaintiff may maintain a suit against governmental action in those limited circumstances in which a case raises issues that are so "unique and of such great importance that they ought to be decided in furtherance of the public interest." *Terracor*, 716 P.2d at 799; *see also Jenkins v. State*, 585 P.2d 442, 443 (Utah 1978). This standard recognizes the need to have issues of great public importance resolved in compliance with the law when a court can act within its institutional and constitutional limitations. The dispute must (1) raise a statutory or constitutional issue of substantial public import, (2) be presented by adverse parties, and (3) otherwise be suitable for resolution by the courts.

NPCA was organized for the purpose of protecting the natural beauty of national parks. It asserts a legal interest in the transfer of section 16 to Garfield County for tourist development within Capitol Reef National Park because of possible inimical environmental effects on the park. Specifically, NPCA asserts that the scenic and recreational qualities of the park will be adversely affected if Garfield County paves that part of the Burr Trail that lies within section 16. Although others may also have an interest in the land exchange, it is unlikely that any other party, given the facts of this case, has a greater interest in asserting that the state ought to give priority to nonmonetary values in deciding whether to exchange section 16. Furthermore, this issue is of great importance to the state in properly discharging its fiduciary duties in administering school lands. It is also of great importance to the

public schools and others who are interested in preserving the unique scenic, recreational, archaeological, and paleontological values that exist in some of the state school lands. We therefore hold that NPCA has standing because it raises issues of significant public importance.

### III. PETITION TO INTERVENE

■ NPCA maintains that the Director erred in denying its petition to intervene. The petition asserted that NPCA had a legal interest in the land exchange because its members use and enjoy Capitol Reef National Park and because no other entity had taken steps to ensure the protection of the park's nonmonetary values. The Director denied NPCA's petition on the ground that the Division's consideration of an application for the exchange of land did not constitute an adjudicatory proceeding and that the Division "has no procedures under which a request for intervention in the consideration of an exchange proposal might be granted."

NPCA relies on Utah Code Ann. § 63–46b–1(1)(a) of the Utah Administrative Procedures Act (UAPA) as authority for its right to intervene. That section states that the UAPA governs "all state agency actions that determine the legal rights, duties, privileges, immunities, or other legal interests of one or more identifiable persons, including all agency actions to grant, deny, revoke, suspend, modify, annul, withdraw, or amend an authority, right, or license."

Section 63–46b–1(1)(a) does not support NPCA's position for three reasons. First, the provision, on its face, does not give NPCA a right to intervene in a proceeding for the exchange of state land. Second, the provision does not apply to these proceedings because it did not become law until January 1, 1988, after the petition to intervene was filed. Third, § 63–46b–1(2)(g) of the UAPA explicitly provides that it does not apply to "state agency actions relating to ... contracts for the purchase or sale of ... real property." That rule of law has been adopted in Utah Administrative Rule 632–8–1 (1990), which states that "management and administrative actions concerning specific leases, sales or exchanges are not governed by the procedural requirements of this rule pursuant to 63–46b–1(2)(g)."

The reason for allowing the state to deal with leasing, selling, and exchanging property as an executive decision is not difficult to ascertain. The state, through its various agencies, engages in innumerable transactions for the purchase, sale, exchange, and lease of real and personal property. If these transactions were subject to the delay inherent in adjudicative procedures at the demand of a third party asserting a private interest, government programs dealing with the acquisition and disposition of property could be paralyzed. See *Terracor v. Utah Bd. of State Lands*, 716 P.2d 796 (Utah 1986).

That is not to say, however, that administrative decisions with respect to leasing, selling, or exchanging state property are wholly beyond the rule of law. In many instances, specific statutes or administrative rules establish procedures governing the manner in which state property should be disposed. If those provisions are violated by an administrative agency and a plaintiff has standing to challenge the violation,[1] an action for an injunction might lie. In such a proceeding, a factual record can be developed and the legality of the administrative action may be tested against the governing rules.

In short, the land exchange negotiation was not a proceeding in which NPCA was entitled to intervene. For that reason, we do not reach NPCA's contention that the Division unlawfully denied its request to defer the decision on the land exchange or that the Division failed to make necessary factual and legal determinations in approving the exchange.[2]

---

1. *Terracor v. Utah Board of State Lands,* 716 P.2d 796 (Utah 1986), held that a disappointed would-be purchaser of state property did not have standing.

2. Intervention is a procedure separate and distinct from an administrative declaratory ruling. Although one may not be entitled to intervene, one may be entitled to an administrative declaratory ruling.

## IV. DECLARATORY RULINGS

■ NPCA's request for declaratory rulings was made pursuant to Utah Code Ann. § 63–46a–15 (1986) and Utah Administrative Rules 632–7–1 to –5. It sought rulings on nine issues: (1) whether the authority to approve a land exchange lies with the Board of State Lands or the Division of State Lands, *see Adkins v. Division of State Lands,* 719 P.2d 524 (Utah 1986); (2) whether it is unlawful for the Board to instruct the Division to make a particular decision regarding an exchange, *see id.;* (3) whether an appraiser hired by an interested party to an exchange can be a "suitable person" to perform an appraisal under Utah Code Ann. § 65–1–26; (4) whether the Division must follow specific and established standards for a valid appraisal; (5) whether the Board's policy concerning appeals from Division approval of appraisals is lawful; (6) whether the Board is required to adopt specific land management policies in documentary form; (7) whether the Division may give preference to scenic, aesthetic, or recreational values over income maximization in managing school trust lands; (8) whether the Division's "Management of Sensitive Areas" policy applies to the school trust land exchange at issue; and (9) whether the Division's "Environmental Assessments" policy applies to the school trust land exchange at issue.

The Director responded to the last three requests but refused to answer requests 1 through 6 on the ground that NPCA failed to show the necessary relationship between its requests and its legal interests as required by Rule 632–7–4(1)(d). NPCA asserts that the Director erred in the responses he gave to the last three requests and in refusing to respond to the first six.

At the time NPCA filed its petition, § 63–46a–15 provided a broad, flexible rule whereby a person could obtain declaratory rulings from an administrative agency. That provision stated:

Each agency shall provide by rule for the filing and prompt disposition by the agency of petitions for declaratory rulings as to the applicability of any statutory provision, rule, or order of the agency. Agency rulings disposing of petitions have the same status as agency decisions in cases disposed of by the agency after hearing.[3]

Pursuant to this section, the Board promulgated Administrative Rules 632–7–1 to –5. The statute and implementing rules did not require petitioners to meet narrow standing requirements for an administrative ruling. They required only that the petition "describe[ ] the reason or need for the applicability review," Utah Admin. R. 632–7–4(1)(d), and specify both the "issue, situation or circumstances in which applicability is to be reviewed," *id.* at (c), and "the statute, rule, or order to be reviewed." *Id.* at (b). Section 63–46a–15 also provided that rulings "have the same status as agency decisions in cases disposed of by the agency after hearing."

The Director determined that the declaratory ruling procedure is essentially adjudicatory in nature and that declaratory rulings need not be rendered if they do not affect a petitioner's specific legal interests. According to the Director, declaratory rulings "must focus on the rights, status, or legal relationships of identified individuals," and a petitioner "must provide information that establishes the relationship between the request for a declaratory ruling and [its] legally cognizable interests."

We hold that the Director was correct in requiring such a showing as a prerequisite to obtaining a declaratory ruling. Section 63–46a–15 makes explicit that the procedure for obtaining an administrative declaratory ruling is not the equivalent of a rule-making proceeding. To initiate a rule-making proceeding, a petitioner may have a more generalized interest in the subject matter than is necessary for a declaratory ruling or order. Thus, although § 63–46a–15 does not require the same standing analysis as does a judicial

---

**3.** This section was repealed and replaced by 1988 Utah Laws chapter 72, § 32 and 1987 Utah Laws chapter 161, § 277. The new provision, Utah Code Ann. § 63–46b–21(1), which became effective January 1, 1988, states:

Any person may file a request for agency action, requesting that the agency issue a declaratory order determining the applicability of a statute, or order within the primary jurisdiction of the agency to specified circumstances.

adjudication of constitutional or statutory issues, the petition for a declaratory ruling must "describe the reason or need for the applicability review." Utah Admin. R. 632–7–4(1)(d). This showing is necessary in view of the adjudicatory nature of a declaratory ruling.

Requests 1 and 2 sought a ruling on whether the Board improperly participated in the exchange proceeding. Requests 3, 4, and 5 sought rulings on whether the Division's appraisal procedures were consistent with the law and whether the Division's sole reliance on appraisals submitted by an interested party was consistent with the Division's fiduciary responsibilities. Request 6 sought a ruling on "whether the Board is required to adopt specific land management policies in documentary form."

■■■ With respect to requests 1 and 2, the Director correctly ruled that NPCA did not have a legal interest in whether the Board and Division acted properly within their respective policy-making and administrative duties under *Adkins v. Division of State Lands,* 719 P.2d 524 (Utah 1986).

■■■ We hold, however, that the Director erred in refusing to rule on requests 3, 4, and 5. The central issue of this case is whether the scenic, aesthetic, and recreational values of school trust land should be given preference over maximization of income. The Director addressed the merits of this issue in his response to request 7, which is dealt with below. Part of that issue is whether the Division properly administered the school land trust. Given NPCA's general concern with how the Division was administering the trust, NPCA had a legal interest for the purpose of a declaratory ruling in determining whether the Division was using correct appraisal procedures with respect to trust lands.

4. Rule 632–2–2 provided:

The general management objective for state lands is to provide for the maximum utilization of the natural resources consistent with multiple use-sustained yield principles and proper resource management practices. Coincident with this general objective, the division and board seek to:

The Director addressed the merits of requests 8 and 9 and ruled that the policies set out in a Board document entitled "Surface Policies" were not binding because they had been superseded by Administrative Rule 632–2–2, which became effective July 1, 1987.[4] The Director did not err in these rulings.

## V. SCOPE AND NATURE OF SCHOOL LAND TRUST

■■■ In response to request 7, the Director held that a declaratory ruling was appropriate as to whether the Division, acting on behalf of the state as trustee for the school land trust, could give preference to scenic, aesthetic, or recreational values over income maximization. The Director ruled that the Division could not give priority to nonmonetary values because of its fiduciary duty to manage school trust land for the exclusive economic benefit of the common schools. The Director stated that "[s]ection 16 is held in trust to be disposed of as provided by law for the support of the common schools," that "[a] trustee's loyalty to the trust beneficiary must be undivided," and that the objective of supporting the public schools could not be "subordinated to the pursuit of other values on the land impressed with the trust." He also stated:

To the extent that preservation of non-economic values does not constitute a diversion of trust assets or resources, such an activity may be prudently undertaken. To the extent that . . . the protection of non-economic values is necessary for maximizing the economic value of the property, such protection may be prudently undertaken. When such preservation or protection results in a diversion of assets or loss of economic opportunity, a breach of duty is indicated.

NPCA contends that the Director erred in ruling that it could not give preference to

1. obtain the greatest possible monetary return for school and institutional trusts consistent with sound management practices to which such land is assigned.
2. manage school and institutional trust lands for their highest and best use.
3. perpetuate the renewable natural resources on state lands using conservation practices.

scenic, aesthetic, and recreational values. This issue goes to the heart of the nature of the school land trust.

When the thirteen original colonies formed the United States, each held sovereign control over the lands within its borders. Those lands provided a tax base for financing governmental functions, including public education. As the United States expanded westward, additional states were created on lands that belonged to the United States as territories. The federal government retained ownership over much of the land within those states. Because land owned by the federal government was exempt from taxation by the states, those states had a smaller tax base for financing public education. To provide a source of revenue for public education, Congress granted new states federal lands to be used for the support of public schools. The income from those lands was to be placed in a permanent trust fund for the support of the public schools.[5] *See Andrus v. Utah*, 446 U.S. 500, 522–24, 100 S.Ct. 1803, 1814–16, 64 L.Ed.2d 458 (1980) (Powell, J., dissenting); *Utah v. Kleppe*, 586 F.2d 756, 758–59 (10th Cir.1978), *rev'd sub nom. Andrus v. Utah*, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980).

When Utah became a state, it received land grants from the federal government for various purposes. Section 6 of the Enabling Act provides that "upon admission of said State into the Union, sections numbered two, sixteen, thirty-two, and thirty-six in every township of said proposed state ... are hereby granted to said State for the support of common schools." [6] Section 10 of the Enabling Act mandates that "the proceeds of lands herein granted for educational purposes, except as hereinafter otherwise provided, shall constitute a permanent school fund, the interest of which only shall be expended for the support of said schools."

The State of Utah accepted these lands and agreed to hold them in trust for the purposes for which they were given. Article XX, section 1 of the Utah Constitution provides:

> All lands of the State that have been ... granted to the State by Congress ... are hereby accepted, and declared to be the public lands of the State; and shall be held in trust for the people, to be disposed of as provided by law, for the respective purposes for which they have been granted....

Article X, section 5 of the Utah Constitution provides that the proceeds from the sale of school lands shall be placed in the State School Fund, which is to "be safely invested and held by the state in perpetuity," and that "[t]he interest of the State School Fund only shall be expended for the support of the public elementary and secondary schools." Further, "[t]he State School Fund shall be guaranteed by the state against loss or diversion." The Legislature has delegated the management of the school trust lands to the Board and Division of State Lands and Forestry. Utah Code Ann. § 65A–1–4(1) (Supp. 1992).

In administering the school trust lands, the state, through the Board and the Division, acts as a trustee. In *Duchesne County v. State Tax Commission*, 104 Utah 365, 371, 140 P.2d 335, 338 (1943) (plurality opinion), Justice Larson stated that the school land trust embraced

> all the elements of an express trust, with the state [as] the trustee, holding title only for the purpose of executing the trust.... The trust estate is definite, the trustee is certain, and the purpose of the trust and the use of the fund is definite, certain and particularly characterized. This is sufficient. It must follow that the state holds the [school lands and the proceeds flowing from them] as a trustee of an express trust, limited in the amount, that can be expended, and the purposes and uses thereof.

---

**5.** This grant of school lands is a "solemn agreement" similar to a contract between two private parties. *Andrus v. Utah*, 446 U.S. 500, 507, 100 S.Ct. 1803, 1807, 64 L.Ed.2d 458 (1980).

**6.** Section 3 of the Utah Enabling Act provides "for the establishment and maintenance of a system of public schools, which shall be open to all the children of said State and free from sectarian control." Section 3 also provides that the state shall not impose taxes on property within its borders belonging to the United States.

(Citation omitted.) That statement is in accord with the law established by other courts. *See, e.g., State v. University of Alaska,* 624 P.2d 807, 811 (Alaska 1981); *Gladden Farms, Inc. v. State,* 129 Ariz. 516, 520–21, 633 P.2d 325, 329–30 (1981); *Department of State Lands v. Pettibone,* 216 Mont. 361, 702 P.2d 948, 953 (1985); *State Bd. of Educ. Lands & Funds v. Jarchow,* 219 Neb. 88, 362 N.W.2d 19, 26 (1985); *Oklahoma Educ. Ass'n v. Nigh,* 642 P.2d 230, 235–36 (Okla.1982); *County of Skamania v. State,* 102 Wash.2d 127, 685 P.2d 576, 580 (1984).

The duties of a trustee apply to the state in administering school trust lands. *See, e.g., Ervien v. United States,* 251 U.S. 41, 46–47, 40 S.Ct. 75, 75–76, 64 L.Ed. 128 (1919); *United States v. 78.61 Acres of Land,* 265 F.Supp. 564, 566–67 (D.Neb.1967); *State v. University of Alaska,* 624 P.2d 807, 813–14 (Alaska 1981); *Kadish v. Arizona State Land Dep't,* 155 Ariz. 484, 487, 747 P.2d 1183, 1186 (1988) (The fiduciary duties imposed on the state by virtue of the school trust are "the duties of a trustee and not simply the duties of a good business manager."); *Gladden Farms Inc. v. State,* 129 Ariz. 516, 520, 633 P.2d 325, 329 (1981); *Murphy v. State,* 65 Ariz. 338, 181 P.2d 336 (1947); *State ex rel. Ebke v. Board of Educ. Lands & Funds,* 154 Neb. 244, 47 N.W.2d 520, 523 (1951); *County of Skamania v. State,* 102 Wash.2d 127, 685 P.2d 576, 580 (1984) ("Every court that has considered the issue has concluded that these are real, enforceable trusts that impose upon the state the same fiduciary duties applicable to private trustees.").

All trustees owe fiduciary duties to the beneficiaries of the trust. The duty of loyalty requires a trustee to act only for the benefit of the beneficiaries and to exercise prudence and skill in administering the trust. *See* William F. Fratcher, *Scott on Trusts* § 170 (4th ed. 1987). These are legally binding duties, enforceable by those with a sufficient interest in school trust lands to have standing. *See Terracor v. Utah Bd. of State Lands,* 716 P.2d 796, 799 (Utah 1986); *Jenkins v. Swan,* 675 P.2d 1145, 1148–51 (Utah 1983).

The United States Supreme Court has made clear that the value of school trust lands cannot be used to further other legitimate governmental objectives, even if there is some indirect benefit to the public schools. In *Ervien v. United States,* 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919), the Supreme Court held that a state could not use funds derived from school trust lands to advertise the resources and advantages of the state, even though some benefit might be conferred on the trust. *Lassen v. Arizona ex rel. Arizona Highway Department,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967), held that Arizona could not use sections of school trust lands for the construction of highways without compensating the school trust, even though the construction of highways would increase the value of trust lands by an amount at least equal to the value of the land taken. The Court stated that the trust must "receive full value of any lands transferred from it." *Id.* at 466, 87 S.Ct. at 588. The Court explained:

All these restrictions in combination indicate Congress' concern both that the grants provide the most substantial support possible to the beneficiaries and that *only those beneficiaries profit from the trust.*

. . . [T]he purposes of Congress require that the Act's designated beneficiaries "derive the full benefit" of the grant. . . . [A course should not be followed which could] result in diminishing the benefits conferred by Congress and in effect deflecting a portion of them to the State's highway program.

*Id.* at 467–69, 87 S.Ct. at 588–90 (emphasis added) (quoting letter from former Secretary of the Interior Garfield to the House Committee on the Territories, H.R.Rep. No. 152, 61st Cong., 2d Sess., at 3). Accordingly, the Court required Arizona to compensate the trust fund for the value of the land taken. *Id.* at 469, 87 S.Ct. at 590; *see also ASARCO, Inc. v. Kadish,* 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989).

State courts have also consistently held that school trust lands must be administered for the benefit of the public schools. *Gladden Farms Inc. v. State,* 129 Ariz. 516, 521, 633 P.2d 325, 330 (1987) ("The Enabling Act does not allow trust lands to be used for

subsidizing public programs no matter how meritorious the programs."); *Kadish v. Arizona State Land Dep't*, 155 Ariz. 484, 747 P.2d 1183 (1987), *aff'd sub nom. ASARCO, Inc. v. Kadish*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (dispositional restrictions on school trust lands strictly enforced); *Murphy v. State*, 65 Ariz. 338, 181 P.2d 336 (1947) (trust attaches to proceeds of permanent fund derived from school lands); *Department of State Lands v. Pettibone*, 216 Mont. 361, 702 P.2d 948 (1985) (school lands cannot be disposed of without the trust receiving full value); *State ex rel. Thompson v. Babcock*, 147 Mont. 46, 409 P.2d 808 (1965); *Anderson v. Board of Educ. Lands & Funds*, 198 Neb. 793, 256 N.W.2d 318 (1977); *Oklahoma Educ. Ass'n v. Nigh*, 642 P.2d 230 (Okla.1982) (statutes favoring farmers' and ranchers' leases of school lands held invalid); *Kanaly v. State*, 368 N.W.2d 819, 824 (S.D. 1985) (school trust lands and "any proceeds therefrom, must be applied to the object of the original grant or gift"); *County of Skamania v. State*, 102 Wash.2d 127, 685 P.2d 576 (1984) (statute allowing lumber companies to avoid obligations under contracts for sale of timber from school trust lands breached fiduciary duty).

*State v. University of Alaska*, 624 P.2d 807 (Alaska 1981), dealt with an issue similar to the one at hand. There the state contended that the use of school land as a park for recreational purposes was justified. The Supreme Court of Alaska held that the school land could not be used for recreational purposes without compensating the trust. The court stated:

> The use that can be made of park lands as compared to state lands in general is severely restricted. Trees may not be cut, minerals may not be removed, nor can the land be used for raising farm animals. The general principle is that park lands are to be managed in a way that will increase "the value of a recreational experience." It is apparent that this objective is incompatible with the objective of using university land for the "exclusive use and benefit" of the university. The implied intent of the grant was to maximize the economic return from the land for the benefit of the university. This intent cannot

be accomplished if the use of the land is restricted to any significant degree.

*Id.* at 813. In short, trust beneficiaries do not include the general public or other governmental institutions, and the trust is not to be administered for the general welfare of the state. *Kanaly v. State*, 368 N.W.2d 819, 824 (S.D.1985). As the Eighth Circuit stated in *United States v. Ervien*, 246 F. 277, 280 (8th Cir.1917), *aff'd*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919):

> Congress did not intend that the lands granted and confirmed should collectively constitute a general resource or asset like ordinary public lands held broadly in trust for the people, or that the proceeds should constitute a fund like money raised by taxation for "general purposes."

NPCA relies on the "emerging public trust doctrine" in arguing that school trust land is public land "held in trust for *citizens*." (Emphasis added.) NPCA confuses the public trust that applies to sovereign lands with school trust land. The "public trust" doctrine, discussed in *Colman v. Utah State Land Board*, 795 P.2d 622, 635–36 (Utah 1990), protects the ecological integrity of public lands and their public recreational uses for the benefit of the public at large. The public trust doctrine, however, is limited to sovereign lands and perhaps other state lands that are not subject to specific trusts, such as school trust lands. *Id.* at 635. *See generally* Charles F. Wilkinson, *The Public Trust Doctrine in Public Land Law*, 14 U.C. Davis L.Rev. 269 (1980); Joseph L. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich.L.Rev. 471 (1970). Thus, the beneficiaries and the purposes of the public trust and the school land trust are different.

The distinction between school trust lands and public trust lands has been relied on by the Legislature. Section 65A–1–1(4) of the 1988 Trust Land Management Act defines "public trust assets" as "those lands and resources, including sovereign lands, administered by the division that are not part of the school or institutional trust lands." The Act defines "sovereign lands" as "those lands lying below the ordinary high water mark of

navigable bodies of water at the date of statehood and owned by the state by virtue of its sovereignty." "School and institutional trust lands" are defined as

> those properties granted by the United States in the Utah Enabling Act to the state of Utah in trust and other lands transferred to the trust, which must be managed for the benefit of:
>
> (a) the public school system; or
>
> (b) the institutions of the state which are designated by the Utah Enabling Act.

NPCA also argues that the school trust is not imposed on the school lands but only on the proceeds from the land. For this proposition, NPCA relies on Wayne McCormack, *Land Use Planning and Management of State School Lands*, 1982 Utah L.Rev. 525. Professor McCormack argues that the language in Article XX, section 1 of the Utah Constitution is significantly different from section 10 of the Enabling Act. He argues:

> The enabling act restricts the use of proceeds from school trust lands and is silent about actual use of the land. The Constitution, on the other hand, imposes an obligation to hold the lands "in trust for the people" rather than for the schools. The Constitution could be read to grant the state flexibility to use school lands in a broad public trust fashion, including non-revenue uses, so long as the lands are disposed of "as may be provided by law." This construction would distinguish between the duty owed the school fund following disposition and the duty owed the public while the lands remain in state ownership.

*Id.* at 532.

Under the terms of the Enabling Act and the Constitution, the school land trust is not only imposed on the disposition of proceeds from school trust lands, but also on the use of the land itself.[7] The Enabling Act granted land to Utah for a variety of purposes,[8] and those lands were accepted in trust by the state by Article XX, section 1 of the Constitution. To encompass the variety of purposes for which the federal government conveyed lands to the state, Article XX, section 1 of the Constitution had to be framed in broad terms. Thus, the public lands were to "be held in trust for the people ... *for the respective purposes for which they have been or may be granted ....*" (Emphasis added.) Professor McCormack's view of the state's school trust duties is a result of reading the Enabling Act and the Utah Constitution narrowly and separately, rather than reading them together. Reading sections 6 and 10 of the Enabling Act together with Article XX, section 1 of the Constitution, we conclude that sections 2, 16, 32, and 36 of each township were to be held in trust and the proceeds therefrom were to be disposed of "for the support of the common schools."

We have emphasized the duty of the trustee to maximize the monetary return of school trust lands. We turn now to an issue that is of great importance to this state. Located on some state school lands are unique scenic, archeological, and paleontological sites. Such treasures are legacies of past millennia whose true value could never be expressed in monetary terms. The question is, can such treasures be preserved without violating the terms of the school trust? We think so. Indeed, the Legislature has taken some steps to do that. *See* Utah Code Ann. §§ 9–8–102 to –405.

Although the primary objective of the school land trust is to maximize the economic value of school trust lands, that does not

---

7. McCormack's distinction between trust duties owed during possession of the land and trust duties owed on disposition of the land is essentially an argument that a trustee can use the trust corpus for its own purposes during possession and that the trust obligations attach only on disposition of trust assets or realization of proceeds therefrom. That is not how the trust is structured by the Enabling Act and the Constitution. If that had truly been the intent, it would have been stated explicitly.

8. Land grants were made for the common schools, § 6; public buildings, § 7; the University of Utah, § 8; reservoirs, an insane asylum, a school of mines, a deaf and dumb asylum, a reform school, etc., § 12. *See United States v. Ervien*, 246 F. 277, 279 (8th Cir.1917), *aff'd*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919) ("Each quantity of land with its proceeds was to be devoted to a particular object to the exclusion of all others.").

mean that school lands should be administered to maximize economic return in the short run. The beneficiaries of the school land trust, the common schools, are a continuing class, and the trustee must maximize the income from school lands in the long run. *Scott on Trusts*, § 232. Certainly it would be as much a violation of the state's fiduciary obligations to immediately sell all state school lands as it would be to use the proceeds from the lands for a nontrust purpose.

The Division should recognize that some school lands have unique scenic, paleontological, and archeological values that would have little economic value on the open market. In some cases, it would be unconscionable not to preserve and protect those values. It may be possible for the Division to protect and preserve those values without diminishing the economic value of the land. For example, with appropriate restrictions it may be possible for livestock grazing and perhaps even mineral extraction to occur on a school section without damaging archaeological and paleontological sites. But when economic exploitation of such lands is not compatible with the noneconomic values, the state may have to consider exchanging public trust lands or other state lands for school lands. Indeed, it might be necessary for the state to buy or lease the school lands from the trust so that unique noneconomic values can be preserved and protected and the full economic value of the school trust lands still realized.[9]

In this case, the Division did consider aesthetic and recreational values in deciding to exchange section 16 for Garfield County's lands. NPCA's argument is not that the Division totally failed to consider these values, but that the Division should have given priority to those values over the state's duty to maximize economic return. For the reasons stated above, that position is contrary to the duties imposed on the state and the Division under the school land trust.[10] We hold that the Board did not breach its trust duties by refusing to give priority to the scenic, aesthetic, and recreational values of section 16 over economic values when it approved the land exchange.

## VI. DUTY OF TRUSTEE TO OBTAIN RELIABLE APPRAISALS

NPCA contends that the Division's practice of relying on property appraisals supplied by exchange applicants is in conflict with the state's trust obligations. In the exchange application dated April 23, 1987, Garfield County agreed to "obtain appraisals of both the [County land] and State land using the services of a qualified appraiser acceptable to the Division of State Lands and Forestry." Pursuant to this agreement, the County hired a private appraiser to value the properties. An appraisal was submitted to the County on May 15, 1987, valuing section 16 at $65,000 ($100 per acre) and the various parcels offered by the County at $66,000 ($200 per acre). On November 3, 1987, the Board requested that Garfield County increase its offer. The County complied by offering 3.3 acres of land within the Richfield City Industrial Park valued at $35,000.

Both general trust law and Administrative Rule 632–2–2 require the Board and Division to "seek to obtain the greatest possible monetary return for the school and institutional

9. Justice Durham's argument that the majority holds that a trustee's duty of loyalty precludes consideration of all other legal duties other than maximizing the monetary benefit to the beneficiaries is incorrect. Clearly, trustees have a duty to act according to applicable law. If, for example, the Legislature enacted statewide zoning laws that affected the value of school lands, that would not be a violation of the trust. Nor would mining reclamation laws violate the trust, even though they may have an incidental impact on the value of school lands. Thus, *Board of Land Commissioners v. Mined Land Reclamation Board*, 809 P.2d 974 (Colo.1991), is not inconsistent with anything in this opinion. This does not mean that the state can enact legislation that violates the terms of the trust. Clearly, however, general laws enacted pursuant to the police power are not likely to violate the terms of the trust.

Justice Durham goes beyond that when she argues that "[a] state can never have 'undivided loyalty' to a single interest group; it must consider the health, safety, and welfare of all its people."

10. Even if NPCA were correct, it has neither offered substantive standards for distinguishing section 16 from other school sections with similar noneconomic values nor shown that paving the road is inconsistent with the scenic and recreational values of section 16.

trusts." Utah Admin.R. 632–2–2; *see also* Utah Code Ann. § 65–1–26; *Berner v. Equitable Office Bldg. Corp.*, 175 F.2d 218, 221 (2d Cir.1949); *Terry v. Midwest Ref. Co.*, 64 F.2d 428, 434 (10th Cir.), *cert. denied*, 290 U.S. 660, 54 S.Ct. 74, 78 L.Ed. 571 (1933); *Rippey v. Denver United States Nat'l Bank*, 273 F.Supp. 718, 734 (D.Colo.1967); *Lockwood v. OFB Corp.*, 305 A.2d 636, 638 (Del.Ch.1973); *Ross v. Wilson*, 308 N.Y. 605, 127 N.E.2d 697 (1955). *See generally* William F. Fracher, *Scott on Trusts* §§ 174, 190.6, 208.6 (4th ed. 1987); George G. Bogert & George T. Bogert, *Trusts and Trustees* § 745 (2d rev. ed. 1991).

 In performing that duty, trustees are required to obtain independent appraisals of trust assets before selling them. *Belcher v. Birmingham Trust Nat'l Bank*, 348 F.Supp. 61, 158 (N.D.Ala.1968); *Murphy v. Central Bank & Trust*, 699 P.2d 13, 14 (Colo.Ct.App.1985); *Webb & Knapp, Inc. v. Hanover Bank*, 214 Md. 230, 133 A.2d 450, 457 (1957); *Hatcher v. United States Nat'l Bank of Or.*, 56 Or.App. 643, 643 P.2d 359, 364–65 (1982); *Allard v. Pacific Nat'l Bank*, 99 Wash.2d 394, 663 P.2d 104, 111 (1983).

 An appraisal submitted by a party intending to purchase a trust asset is suspect on its face, even when performed by an independent and reputable appraiser, because the buyer has the opportunity to shop for favorable appraisals. For a trustee to rely on appraisals submitted by a purchaser of trust assets is to leave the trust subject to sharp dealing on the part of the purchaser. For that reason, we hold that a breach of trust occurs when a trustee uses an appraisal submitted by the purchaser as the basis for ascertaining the fair market value of a trust asset. To comply with its fiduciary duties, the Division itself must obtain the appraisals on which it bases its decision.

The Division relied solely on the appraisals submitted by Garfield County in ascertaining the fair market value of both section 16 and the County's land. Given the procedure employed by the Division, the appraisals submitted by Garfield County may not accurately reflect the fair market value of the parcels, even though the appraised value of the County land offered appeared to be well in excess of section 16's value.

Accordingly, we hold that the Division breached its trust duty by not securing appraisals for both section 16 and Garfield County's land from appraisers either retained or employed by the Division.[11] Whether the Division should charge the cost of such appraisals to a purchaser is a question we do not address.

## VII. MEMORANDUM OF UNDERSTANDING

 NPCA argues that the Division's exchange of section 16 for Garfield County's property violated the memorandum of understanding between Governor Bangerter and the Secretary of the Interior that provides for the exchange of state school lands lying within federal parks and other federal enclosures. The Division ruled that the exchange did not violate the memorandum because the Secretary of the Interior had agreed that it would not. The Director found that "[t]he Secretary indicated to the Governor that the exchange with Garfield County would not result in any significant impediment to other Federal exchange options." We decline to read more into the memorandum than did the parties to it.

NPCA's remaining contentions are also without merit. NPCA's contention that multiple use-sustained yield principles control unless they conflict with trust obligations fails because trust obligations take priority and must first be met before consideration can be given to multiple use-sustained yield principles. *See* Utah Code Ann. § 65–1–14 (1986); §§ 65A–1–2(4), 65A–2–1 (Supp.1992); Utah Admin.R. 632–2–2. Similarly, NPCA's contention that the management of section 16 is controlled by legislation protecting national parks, *see* 16 U.S.C. §§ 1, 1a–1 (1992), fails because the Act establishing Capitol Reef

---

11. Although we have ruled that the Division correctly denied NPCA's petition to intervene as a party for all purposes, we also hold that NPCA has a limited right of intervention on this issue. Courts generally have broader powers in trust cases in making certain that trusts are properly administered. That power and the overriding public interest in the proper administration of the school land trust justify limited intervention on this critical issue of trust administration.

National Park preserved the status of state school sections.[12] 16 U.S.C. §§ 273, 273a.

## VIII. CONCLUSION

We remand this case to the Division for a determination of whether the appraised values of section 16 and the Garfield County lands offered in exchange represent the full value of those lands.

The stay presently in effect will continue until the Division makes the requisite determinations that the value of the land exchanged for section 16 is adequate under its trust obligations.

HALL, C.J., and HOWE, Associate C.J., concur.

DURHAM, Justice, concurring in the result:

I concur in the result reached by the majority. However, I disagree with the suggestion that the state must *always* give the economic interests of the school trust priority over all other considerations in managing trust lands. The majority is correct that the state has a significant duty to the beneficiaries of the school trust, which ordinarily will prevail, but I believe that in some situations it is permissible for the state to give priority to factors besides economic gain to the school trust.

The majority reasons that (1) the state holds section 16 in trust for the school system, (2) the state is subject to the same duties as a private trustee, and (3) a private trustee has a duty of undivided loyalty to the beneficiaries of a trust, therefore (4) the state has a duty of undivided loyalty to the school system, and (5) economic gain to the school system is the only proper consideration in managing section 16. This reasoning

is faulty in treating a state exactly the same as a private trustee. A state has powers and duties far beyond those of an ordinary citizen. It has both the power to make almost any law or regulation, limited only by the state and federal constitutions, and the responsibility to legislate in the interest of its citizens. A state can never have "undivided loyalty" to a single interest group; it must consider the health, safety, and welfare of all its people. It also has the duty to manage and preserve public lands for the benefit of present and future generations. These responsibilities may occasionally conflict with the duty to maximize income for the school trust. While the state's duties to the school system are important, they cannot and do not override every other obligation.[1]

Taken to its logical extreme, a strict requirement of undivided loyalty in managing trust land would lead to absurd results. It would require the state to allow any use of any tract of trust land, free from all regulation, as long as the trust received enough money. In theory, a business using trust land should be exempt from safety, pollution, and similar laws because compliance with these laws would make the enterprise less profitable, thereby reducing the amount a business would be willing to pay for the land. The state's obligation to obtain the greatest possible financial return on school trust land obviously cannot outweigh every other social concern.

To illustrate, suppose an applicant proposes to build a toxic waste disposal facility on trust land at the head of a major water source. If the applicant offers more money than the trust could ever hope to receive from any other use, a strict requirement of undivided loyalty to the school trust arguably would require the state to accept the project. However, such a project could seriously

---

**12.** NPCA cites *Free Enterprise Canoe Renters Ass'n v. Watt*, 711 F.2d 852 (8th Cir.1983), and *United States v. Brown*, 552 F.2d 817 (8th Cir. 1977), for the proposition that federal legislation protecting national parks extends beyond federal boundaries to state inholdings. Those cases are distinguishable. First, neither dealt with school trust land law, which is binding on both the state and federal governments. Second, in both cases the states had ceded jurisdiction to the federal government. Finally, both cases dealt with spe-

cific attempts by the federal government to regulate activity on the state inholdings.

**1.** Even a private trustee can never really have undivided loyalty to a beneficiary, for a trustee is always subject to the broad powers of the state. A private trustee must manage trust property in accordance with the law, and a trustee's duty to obey the law is higher than his or her duty to the beneficiaries.

threaten several communities' drinking water, and the legislature has enacted laws designed to avoid such threats.[2] It would be ludicrous to *force* the state to make the sale and allow the project, notwithstanding health, environmental, or other consequences, simply because approval would provide the greatest monetary return to the school trust fund. Nothing in the Utah Constitution or Enabling Act would require such a result. In such a situation, the Board would be able to refuse the application.

None of the cases upon which the Board and the majority rely address the situation in which the *use* of trust land is at issue. For the most part, those cases consider only the amount of money a state must get in return for any chosen use. For example, in *Lassen v. Arizona Highway Department*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967), the issue was not whether the state highway department could build roads through trust lands, but whether and how much the department had to compensate the schools. In *Oklahoma Education Ass'n v. Nigh*, 642 P.2d 230 (Okla.1982), the court held simply that the school trust had to receive full value for land used in a low-income farming program. And in *County of Skamania v. State*, 102 Wash.2d 127, 685 P.2d 576 (1984), the question was not whether the land had to be used for timber production, but whether the state could release the timber producers from their contracts, thus settling for less money than they were owed. No authority has been cited holding that school trust responsibilities require a state to choose a specific land management option solely because it would result in the greatest profit to the trust fund.[3]

Indeed, the Colorado Supreme Court held recently that the state did not violate trust obligations by allowing consideration of non-economic factors, including the scenic and aesthetic effects of a proposed use, in managing trust lands. In *State Land Commissioners v. State Mined Land Reclamation Board*, 809 P.2d 974 (Colo.1991), the court considered the validity of a statute that conditioned the issuance of a mining permit on compliance with local zoning ordinances. Plaintiff Conda sought to engage in a major mining operation on state trust lands that Boulder County had zoned for forestry. The County denied Conda's application for a special use permit, primarily on scenic, aesthetic, and other noneconomic grounds.[4] Conda sought review in the district court, but the district

---

**2.** The Hazardous Waste Facility Siting Act directs the Solid and Hazardous Waste Control Board to adopt guidelines for the siting of hazardous waste storage and disposal facilities. These guidelines shall "ensure that ... the wastes located [at the facilities] will not constitute an unacceptable health hazard or impact the environment in an unacceptable manner." Utah Code Ann. § 19–6–204(1). The statute directs the Board to consider factors such as the risk of contamination to ground and surface water through leaching and runoff. *Id.* § 19–6–204(2). The regulations promulgated by the Board prohibit commercial hazardous waste facilities within certain distances of underground and surface water sources. Utah Admin.R. 315–3–36(b).

**3.** Further, the most significant cases interpret and apply the New Mexico–Arizona Enabling Act of 1910, which contains specific provisions regarding disposition of trust lands and proceeds. *See, e.g., ASARCO Inc. v. Kadish*, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989); *Lassen*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967); *Ervien v. United States*, 251 U.S. 41, 40 S.Ct. 75, 64 L.Ed. 128 (1919). These cases do not necessarily control interpretation of the *Utah* Enabling Act, which does not contain such provisions.

**4.** The Boulder County Board of Commissioners denied the application because

> [the mining operations] would not be in harmony with the character of the neighborhood and would not be compatible with the surrounding area because of dust, noise, and traffic; they would adversely affect wildlife in the area and would result in removing an area of old forest growth; they would seriously affect the foothills scenic vista; they would place undue burdens on the existing community of Eldorado Springs; they would adversely affect the safety of recreational and destination bicycle traffic in the area; they would cause major increases in heavy traffic with resulting traffic hazards; they would cause a significant increase in air and noise pollution; they would not provide adequate visual mitigation during the mining phases of the operations; Conda's proposal was lacking a proven reclamation plan; and the proposed mining operations would be detrimental to the health, safety, and welfare of present and future inhabitants of the county.

809 P.2d at 979.

court affirmed the Reclamation Board's denial of a mining permit.

The supreme court affirmed. Among other things, the court concluded that the state constitution did not prohibit the consideration of noneconomic factors in managing school trust lands, even when the trust would receive less money as a result. The court noted:

> So also, the fact that the Reclamation Board adheres to the statutory standards for the issuance of a mining permit does not result in diverting revenues from the public school fund. *The constitutional grant of authority to the School Land Board to dispose of school lands in such manner as will secure the "maximum possible amount therefor," Colo. Const. art. IX, § 10, was not intended as a license to disregard reasonable legislative regulations simply because compliance with such regulations might reduce the amount of revenues otherwise available from the leasing of school lands.*

*Id.* at 987 (emphasis added) (citation omitted). Thus, Colorado has determined that a state may choose a less-than-economically-optimal land management strategy in pursuit of other goals.[5]

The majority opinion acknowledges that failure to preserve scenic, paleontological, or archaeological values may occasionally be "unconscionable," but the alternatives it proposes are inadequate. The majority concludes that in such a situation, the state may have to consider either exchanging other state lands for school trust lands or leasing or buying the lands from the trust. Neither of these options would be satisfactory.

First, a land exchange would usually be impractical. Someone seeking to buy or lease a tract of trust land most often does so because he or she has a site-specific plan for that land. Most applicants simply would not be willing to use any other state land. For example, in this case, Garfield County wants section 16 precisely *because* the Burr Trail runs through it. The County would have no reason to purchase a different tract of state land. Thus, an exchange process would in most cases deprive the trust of the money it would receive under the applicant's proposal. The majority apparently would deem this a breach of the trust.

Second, if the state wishes to protect environmental, social, or other noneconomic values, it is not required to lease or purchase the affected land.[6] Even assuming that the Board has the power to take such action, the state does not necessarily have to pay compensation to prevent an "unconscionable" use of property. The state has broad authority to regulate or prevent certain uses of land under its police power; it need compensate a landowner only if the regulation deprives him or her of all economically viable use of the land, i.e., when it effects a "regulatory taking." *See, e.g., Lucas v. South Carolina Coastal Council,* 505 U.S. ——, —— – ——, 112 S.Ct. 2886, 2893–94, 120 L.Ed.2d 798 (1992). Thus, in the case of *private* ownership of land (even if the land is held in trust for the school system), the state has to pay compensation only if it effects such a taking. Therefore, by requiring the state to pay full compensation whenever a restriction on use prevents the trust from receiving the highest possible amount of money, the majority would in effect give state-owned trust land greater protection against government regulation than that provided to private land. Such a result seems illogical and unnecessary.

I do not mean to trivialize the state's duty to manage trust lands for the benefit of the school system. Economic gain to the school trust is still the primary consideration in managing trust lands. The Utah Enabling Act granted the land to the state "for the support of common schools." Utah Enabling

---

5. California also follows a multiple-use approach in managing school trust lands. A statute directs the state lands commission to consider "beneficial uses," which include development and maintenance of hiking trails and primitive campsites. Cal.Pub.Res.Code § 6201.5 (West Supp.1993); *see* Kedric A. Bassett, Comment, *Utah's School Trust Lands: Dilemma in Land Use Management and the Possible Effect of Utah's Trust Land Man-*

*agement Act,* 9 J. Energy L. & Pol'y 195, 203 (1989).

6. Such a scheme would force the state to match the highest bid for the land, since any lower level of compensation would presumably be a breach of the trust.

926

Act § 6. The Utah Constitution provides that grant land shall be held in trust for the purposes for which it was granted. Utah Const. art. XX, § 1. These provisions impose on the state a strong obligation to manage trust lands for the benefit of the public school system, and most often this duty will prevail. However, this obligation cannot always override every other responsibility. Other state interests may at times outweigh the importance of financial gain to the trust. In such situations, it would be permissible for the Board to act in accordance with those other interests. Foregoing the most financially profitable alternative would not always be a breach of the trust.

In this case, however, I feel constrained to conclude that the Board did not act improperly when it refused to look at aesthetic and other noneconomic factors in considering the proposed land exchange. The Board has a constitutional and statutory duty to operate trust lands for the benefit of the school trust. While this duty does not trump every other state obligation, it is nonetheless very important. Further, statutes in effect both at the time the decision was made and at present dictate that trust responsibilities take priority over multiple-use principles in managing trust land. *See* Utah Code Ann. § 65–1–14 (1986 repl. vol.) (repealed); *id.* § 65A–1–2(4) (Supp.1992). Finally, the public trust doctrine, which applies to other public lands, does not apply to lands granted to the state for the benefit of the school system rather than for the public generally. In this situation, then, I cannot say that the interest in preservation outweighs the state's responsibility to obtain the greatest possible economic return from trust land. I therefore concur in the result reached by the majority.

ZIMMERMAN, Justice, concurring:

I join in Justice Durham's separate opinion. I write only to observe for the benefit of bench and bar that footnote 11 of the majority opinion appears to me to conflict with and may ultimately obviate much of the textual discussion of intervention in part III of that same opinion.