SIERRA CLUB, Chemical Weapons Working Group, and Vietnam Veterans of America Foundation, Petitioners,

v.

UTAH SOLID AND HAZARDOUS WASTE CONTROL BOARD, Respondent,

and

United States Army and EG & G Defense Materials, Inc., Intervenors.

No. 971313–CA.

Court of Appeals of Utah.

Aug. 20, 1998.

Mick G. Harrison, Greenlaw, Berea, Kentucky, for Petitioners.

Jan Graham, Atty. Gen., Laura Lockhart, Asst. Atty. Gen., and Raymond Wixom, Staff Atty. and Special Asst. Atty. Gen., Salt Lake City, for Respondent.

Alan D. Greenberg and Robert H. Foster, U.S. Dept. of Justice, Environment and Natural Resources Div., Denver, Colorado, for Intervenor United States Army.

David W. Tunderman and Craig D. Galli, Salt Lake City, for Intervenor EG & G Defense Materials, Inc.

Before DAVIS, WILKINS and ORME, JJ.

## OPINION

ORME, Judge:

Sierra Club, Chemical Weapons Working Group, and Vietnam Veterans of America Foundation (collectively referred to herein as Sierra Club) petition this court for review of a final order of the Utah Solid and Hazardous Waste Control Board pertaining to the Tooele Chemical Agent Demilitarization Facility (referred to by the parties and herein as TOCDF) located at the Deseret Chemical Depot, formerly known as Tooele Army Depot South. We decline to disturb the Board's order.

## FACTS

The Deseret Chemical Depot is one of eight sites in the continental United States housing the nation's chemical weapons stockpile. The country's entire stockpile consists of approximately 30,000 tons of chemical agent. Housed at the Depot is over two-fifths of the stockpile—more than 13,000 tons. These chemicals include the nerve agents GB (sarin) and VX, and the blister agents H, HD, and HT (mustard gas). The chemicals are contained in weapons, such as rockets, artillery shells, bombs, and mines, and in one-ton storage devices called "ton containers." The Army stores these materials at Tooele in earth-covered magazines called "igloos," in fenced storage yards, and in warehouses.

The risk from continued storage of these agents has been a matter of long-standing concern. In 1989, the Board's Executive Secretary approved the Army's hazardous waste plan for construction of a hazardous waste treatment facility to destroy the chemical weapons stockpiled at the Depot. The Executive Secretary issued the authorizing permit only to the Depot, although the United States Army, TOCDF's owner, had contracted with EG & G Defense Materials, Inc. to operate TOCDF, and EG & G began doing so in 1993.

In July 1993, the Army completed construction of TOCDF, which is comprised of five separate incinerators: two liquid incinerators used to burn liquid agent that has been drained from munitions and bulk containers; a Deactivation Furnace System used to incinerate munitions that have been drained of agent but are still contaminated; a Metal Parts Furnace used to decontaminate metal parts that have been drained of agent; and a Dunnage Incinerator used to burn non-agent contaminated and agent contaminated dunnage, such as pallets and spent carbon filters.

Before TOCDF operations could begin, the permit and federal and state law required the Army to conduct a series of "trial burns" to ensure that the facility could operate safely. In late 1995, the Army submitted trial burn plans to the Executive Secretary for approval. After requiring the Army to conduct surrogate trial burns with surrogate chemicals, in June 1996 the Executive Secretary approved the trial burn plans for the liquid incinerators and the Deactivation Furnace System. The Army scheduled four trial burns for these incinerators: a "shakedown" burn with no chemical agent, an "R & D" burn with no agent, a shakedown burn with chemical agent, and a "demonstration" burn with chemical agent. In August 1996, TOCDF began the shakedown burn with chemical agent.

In conjunction with trial burn approval, the State Division of Environmental Quality, through a contractor, conducted a Screening Health Risk Assessment (SRA) which analyzed the expected effects of theoretically high TOCDF emissions on human health and the environment. The Division conducted the SRA to address two primary concerns: whether TOCDF emissions would cause cancer and whether they would cause other types of illness. The SRA, following United States Environmental Protection Agency (EPA) guidelines, examined the potential exposure to six hypothetical groups living downwind of TOCDF: adults and children residing at the point of maximum emissions, three types of farmers, and subsistence fishermen. The Division incorporated conservative assumptions into the SRA, such as calculating the risks from exposure for up to thirty years of TOCDF emissions even though TOCDF is expected to operate for only seven years. The Division found, inter alia, that the overall cancer risks from dioxin exposure do not exceed EPA guidance levels for ten, fifteen, and thirty year operating periods. The SRA did not calculate the non-cancer effects of dioxin exposure because the EPA has not adopted a reference dose for dioxin.

## AGENCY DISPOSITION

In June 1996, the Executive Secretary granted the Army's request to modify the permit by adding intervenor EG & G as a permittee and operator of TOCDF. This modification prompted Sierra Club to file its First Request for Agency Action on July 18, 1996, in which it asked the Board to withdraw its modification of the permit which

authorized EG & G to be a permittee and operator of TOCDF. Sierra Club subsequently filed a Second Request for Agency Action on July 22, 1996, in which it attacked the Executive Secretary's June 1996 approval of the agent trial burn plans for the liquid incinerators and the Deactivation Control Furnace. In its second request, Sierra Club claimed that TOCDF cannot be operated safely and that respondents failed to demonstrate compliance with legal requirements for hazardous waste incineration. Sierra Club therefore sought reversal of the Executive Secretary's approval of the trial burns and a Board order enjoining respondents from beginning any chemical incineration at TOCDF.

The Board held a hearing on Sierra Club's requests on March 18–20 and April 17, 1997. The Board ordered that Sierra Club would have twelve hours to present its case, the Army and EG & G would collectively have ten hours, and the Executive Secretary would have five hours. On April 17, the Board orally denied Sierra Club's two requests and issued its written order on July 22, 1997. Sierra Club then filed with this court a petition for review of the Board's order denying its two requests for agency action. The Army and EG & G subsequently intervened in this proceeding.

## ISSUES

Sierra Club raises three principal arguments.[1] First, Sierra Club contends that the Board erred in failing to terminate or revoke the TOCDF permit in the face of evidence of substantial noncompliance with the Utah Solid and Hazardous Waste Act and endangerment to human health and the environment. Second, Sierra Club argues that the Board erred in allowing EG & G to operate TOCDF because EG & G is unable to operate the facility safely and in compliance with law. Third, Sierra Club contends that the Board violated its procedural Due Process rights by unreasonably limiting Sierra Club's time to present evidence and to crossexamine witnesses at the hearing. The Board, in addition to responding to Sierra Club's allegations, argues that Sierra Club lacks standing to petition this court for review. We first address the Board's standing argument.

## STANDING

The Board argues that, although Sierra Club's standing was not considered below,[2] Sierra Club has failed to demonstrate that it has standing to petition this court for review because it cannot meet any of the three recognized standing criteria. The Board's argument is unpersuasive, and we conclude that Sierra Club has standing to petition this court for review because it raises issues of significant public importance.

"[A] plaintiff may maintain a suit against governmental action in those limited circumstances in which a case raises issues that are so 'unique and of such great importance that they ought to be decided in furtherance of the public interest.'" *National Parks & Conservation Ass'n v. Board of State Lands*, 869 P.2d 909, 913 (Utah 1993) (quoting *Terracor v. Utah Bd. of State Lands*, 716 P.2d 796, 799 (Utah 1986)). Under this standard, "[t]he dispute must (1) raise a statutory or

---

1. At oral argument, counsel for Sierra Club acknowledged that he had not moved for *pro hac vice* admission before this court, reasoning that he had so moved before the agency below. Technically, the case here is not an appeal but an original proceeding in this court. *See generally* Utah Code Ann. § 63–46b–16(1) (1997); Utah R.App. P. 3(c), 14(a). Counsel for Sierra Club should therefore have moved for *pro hac vice* admission in this proceeding. Rule 40(d) of the Utah Rules of Appellate Procedure provides as much: "An attorney who is licensed to practice before the bar of another state or a foreign country but who is not a member of the Bar of this state, may appear, upon motion, *pro hac vice*." Although counsel for Sierra Club failed to comply with this requirement, we nonetheless suspend the rule for the convenience of the opposing parties and the court. Despite this suspension, counsel is directed to comply with Rule 40(d) in the future.

2. "Either party, or the court on its own motion, may properly raise the issue of standing for the first time on appeal." *Wade v. Burke*, 800 P.2d 1106, 1108 (Utah Ct.App.), *cert. denied*, 800 P.2d 1105 (Utah 1990). *Accord Terracor v. Utah Bd. of State Lands*, 716 P.2d 796, 798 (Utah 1986) (stating that appeals court can address standing issue sua sponte); *Sierra Club v. Department of Envtl. Quality*, 857 P.2d 982, 984 (Utah Ct.App. 1993) (same).

constitutional issue of substantial public import, (2) be presented by adverse parties, and (3) otherwise be suitable for resolution by the courts." *Id.*

In *Sierra Club v. Department of Environmental Quality*, 857 P.2d 982 (Utah Ct.App. 1993) (*Sierra Club I*), a somewhat similar case involving Sierra Club's challenge to an operating permit for a Tooele County commercial hazardous waste incinerator, we raised sua sponte Sierra Club's lack of standing and dismissed its petition for review. *See id.* at 983. In *Sierra Club I*, Sierra Club took issue with the Executive Secretary's approval of the operation-plan application for the incinerator. *See id.* at 984. Specifically, Sierra Club alleged that the applicant failed to provide evidence that emergency response plans had been coordinated with emergency personnel and that the application was otherwise incomplete. *See id.* Sierra Club alleged that these two errors in the application-approval process impaired its members' enjoyment of Western Utah because the incinerator, once it began operating, would generate pollution. *See id.* at 986.

In addition to concluding that Sierra Club lacked standing on two other asserted grounds, we held that it failed to raise any issues of significant public importance:

> Sierra Club is challenging determinations by the Board that constitute internal procedural decisions preceding any public involvement in the permit process. The issues, at this stage, are not of great public importance and it is not in the public interest to seek review of the Board's internal operating procedures.

*Id.* at 987.

■ The same cannot be said of the present case. In contrast to *Sierra Club I*, in this case the Executive Secretary has approved trial burns with chemical agents, the Army has conducted such burns since August 1996, and the Board has fielded public comment. Sierra Club also alleges several violations of Utah law, challenges the Division's and the Army's safety assessment measures upon which burn approvals were based, and identifies specific accidents at TOCDF involving actual chemical agent. Sierra Club's arguments are therefore of great public importance and their resolution is inarguably in the public interest.

TOCDF is a matter of significantly greater public concern, both locally and nationally, than was the permit prematurely challenged in *Sierra Club I*. TOCDF is the first facility of its kind in the continental United States, and it processes some of the deadliest substances on earth in relatively close proximity to a major metropolitan area. Consequently, the safety of TOCDF operations, which will continue for seven years, are of undeniably significant public importance.

Our Supreme Court's ruling in *National Parks & Conservation Ass'n v. Board of State Lands*, 869 P.2d 909 (Utah 1993), strongly supports our conclusion that the issues raised by Sierra Club are of substantial public concern. *National Parks* dealt with a proposed land swap and development within Capitol Reef National Park and along the Burr Trail. *See id.* at 913. The National Parks and Conservation Association (NPCA) challenged the proposal and the Utah Supreme Court ultimately held that NPCA had standing because it raised issues of significant public importance. *See id.* at 913–14. Those issues included the State's discharge of its fiduciary duties in administering school trust lands and in preserving scenic, recreational, archaeological, and paleontological values related to those lands. *See id.* In comparing the issues in *National Parks* to those Sierra Club raises in this case—namely, allegedly substantial risks to human health and safety—the issues in this case clearly qualify as issues of significant public importance.

We conclude that Sierra Club has standing to petition this court for review. Given our conclusion, we need not address the alternative bases for standing.

## NONCOMPLIANCE WITH UTAH LAW & ENDANGERMENT TO HUMAN HEALTH & THE ENVIRONMENT

Sierra Club first argues that the Board erred in failing to terminate or revoke the TOCDF permit in light of evidence of substantial noncompliance with the Utah Solid and Hazardous Waste Act and evidence that

TOCDF emissions endanger human health and the environment.

## Standard of Review

In its opening brief, Sierra Club contends that its petition challenges the Board's factual findings and therefore its claims should be reviewed under the "substantial evidence" standard of review. The Board argues that Sierra Club failed to marshal the evidence, as is required for challenges to fact findings. In its reply brief and at oral argument, Sierra Club restated its position, claiming it is not challenging the Board's findings of fact but is instead challenging the Board's allegedly erroneous application of law to fact. In light of Sierra Club's clarification of its position, we necessarily accept the Board's factual findings as uncontested and therefore address only the Board's application of the law to the uncontested facts.

When a petitioner challenges an agency's application of law to fact, we apply a standard of review that is not static, but is instead determined on a sliding scale: "[An] agency's application of the law to the facts may, depending on the issue, be reviewed by an appellate court 'with varying degrees of strictness, falling anywhere between a review for "correctness" and a broad "abuse of discretion" standard.'" *Drake v. Industrial Comm'n*, 939 P.2d 177, 181 (Utah 1997) (quoting *Langeland v. Monarch Motors, Inc.*, 307 Utah Adv. Rep. 3, 4 (Utah 1996), *withdrawn*, 952 P.2d 1058 (Utah 1998)). *See State v. Pena*, 869 P.2d 932, 937–939 (Utah 1994). Thus, in deciding upon the level of discretion we accord to the agency in such situations, we consider "factors such as policy concerns and an agency's expertise." *Drake*, 939 P.2d at 181 n. 6.

■ The present case involves highly technical, specialized scientific knowledge which is uniquely within the Board's expertise. *Cf. Professional Staff Management, Inc. v. Department of Employment Sec.*, 953 P.2d 76, 79 (Utah Ct.App.1998) (concluding that court would review agency decision with only moderate deference because applying relevant law required little specialized knowledge uniquely within agency's expertise); *Allen v. Department of Employment Sec.*, 781 P.2d

888, 890 n. 4 (Utah Ct.App.1989) (same). We therefore accord the Board a relatively high degree of deference in reviewing its application of the law to the facts in this case.

## Analysis

Sierra Club contends that the trial burns with agent present a hazard to human health or the environment, and therefore the Board should have revoked TOCDF's trial burn permit. The applicable rule provides:

The Executive Secretary shall approve a trial burn plan if it finds that:

(i) The trial burn is likely to determine whether the incinerator performance standard ... can be met;

(ii) The trial burn itself will not present an imminent hazard to human health or the environment;

(iii) The trial burn will help the Executive Secretary to determine operating requirements to be specified ...; and

(iv) The information sought ... cannot reasonably be developed through other means.

Utah Admin. Code R315–3–20(b)(5) (Supp. 1997). Sierra Club therefore challenges the second of the four criteria which must be satisfied before the Executive Secretary may approve a trial burn plan. More specifically, Sierra Club uses the SRA's alleged deficiencies to attack the subsequent trial burn approvals. Sierra Club's opening brief takes a shotgun approach to this issue, an approach Sierra Club refined at oral argument by limiting its challenge to the SRA's inadequacy in four discrete areas: (1) dioxin risk to infants from TOCDF emissions; (2) effects of TOCDF emissions on consumers of locally produced dairy products; (3) effects of open burning/open detonation emissions when combined with TOCDF stack emissions; and (4) effects of mustard gas emissions from the stack that ventilates the waste handling areas (HVAC stack).

### a. Dioxin Risk to Infants

Sierra Club contends that the SRA failed to address two concerns relating to the risk to infants from TOCDF dioxin emissions: the actual level of infant dioxin exposure

from TOCDF emissions and the safe level of infant dioxin exposure from TOCDF emissions. Specifically, Sierra Club argues that in an early draft of the SRA, the Division calculated that the dioxin exposure risk to subsistence farmers' breast-fed infants was over fifty times greater than the acceptable dose. Sierra Club claims that after reaching this conclusion, the Division then deleted this data from the SRA, rather than further addressing this dioxin risk to subsistence farmers' breast-fed infants. Sierra Club therefore maintains that the Division violated its affirmative duty to protect the public by omitting this data from the SRA. Sierra Club asks this court, at a minimum, to remand these issues to the Board for it to determine the actual and acceptable dioxin risks to breast-fed infants.

■ Given the deference we owe the Board's decision, we reject Sierra Club's allegations that TOCDF trial burn operations present an unacceptable dioxin exposure risk to nursing infants and that the Division should have addressed this risk in the SRA. Several considerations support this conclusion.

First, we note that there is considerable debate in the scientific community concerning safe levels of dioxin exposure and therefore the fact that Sierra Club can point to some studies suggesting an unacceptably high dioxin risk is not determinative, especially given the conflicting testimony before the Board. Given the level of debate over safe dioxin dosage, the Division's omission of analysis concerning breast-fed infant dioxin exposure is not unreasonable. The Board was in no way misled. It heard testimony that such an analysis was not included in the SRA because no reference dose for breast-fed infants has been generally accepted and that omitting analysis in the absence of a reference dose accords with EPA guidance and is standard practice for risk assessments of the type conducted here. Moreover, the Board heard testimony that the EPA did not recommend using one of the reference doses proposed by Sierra Club and that, just as there are conservative breast-milk ingestion models, like those asserted by Sierra Club, there are also more liberal models.

Second, Sierra Club did not present the Board with credible evidence that any deficiencies in the SRA pointed up imminent hazards to human health or the environment *as a result of trial burn operations*. More specifically, what is at issue here is not the health risk from full long-term operation of TOCDF—the only type of operation the SRA addressed—but rather the risk from the preliminary trial burns, which must be conducted before the Executive Secretary can approve full operation of TOCDF. In other words, despite the fact that the SRA's outlook was ten, fifteen, and thirty years of operation, Sierra Club wishes to translate possible dioxin risk from such long-term operation to the relatively short-term trial burns at issue here. Moreover, Sierra Club's argument is contrary to testimony by an expert to the effect that when the SRA dioxin calculations are applied to the shorter term trial burn period, the results indicate no appreciable risk to human health.

Additionally, Sierra Club bases its dioxin arguments largely upon the SRA which, by its very nature, was never intended to provide accurate, specific numbers regarding actual TOCDF operations. The expert explained that the purpose of a screening risk assessment is to "provide a conservative estimate of the possible risk of health hazards posed by chemical emissions from a facility" and that "conservative" means the assessment includes "numerous assumptions or calculation procedures that result in a broad margin of safety between the calculated risk estimate ... and the likely risk to human health." In other words, the assessment makes assumptions that "intentionally overstat[e] what is known to be true." Because of this broad safety margin, it is not appropriate to interpret the assessment's risk estimates as "true" or "absolute." Instead, a screening risk assessment "is a method for determining plausible upper limits of risk, not actual probability or risk of harm." If the assessment, given all the conservative worst-case assumptions, shows that there is no risk, no further study is required. Conversely, if the assessment indicates that a potential risk exists, more refined and specific analysis is conducted.

The Division's SRA incorporated a number of conservative assumptions. For example, it addressed operating periods not only much longer than the trial burns at issue here, but also much longer than TOCDF's expected operating life; the SRA assumed that TOCDF would emit all seventeen toxic types of dioxin even though this would not be the case, *see Chemical Weapons Working Group, Inc. v. United States Dep't of the Army*, 935 F.Supp. 1206, 1213 (D.Utah 1996), *aff'd*, 111 F.3d 1485 (10th Cir.1997), and it assumed simultaneous full-scale operation of all the incinerators, around-the-clock, for 365 days per year.

Thus, considering the scientific debate over dioxin exposure, and the SRA's long-term focus and conservative assumptions, Sierra Club failed to present any persuasive evidence that dioxin emissions from TOCDF trial burn operations present an imminent hazard to human health or the environment. Thus, given the evidence before the Board and the deference we accord it, we see no error in the Board's decision in this regard.[3]

### b. Local Dairy Products

Sierra Club also contends that the Division omitted from the SRA the effects of TOCDF emissions on consumers of locally produced dairy products. Sierra Club argues that because the risk estimate for nonsubsistence farmers fell right at the State/EPA acceptable level, if the SRA risk estimate had included local dairy consumption, the cancer risk estimate would have necessarily exceeded the State and EPA standards. Sierra Club further alleges that an EG & G survey showed that a local dairy producer actually existed but wished to remain anonymous, and that the Division therefore improperly omitted any local dairy analysis from the SRA. Sierra Club contends that the Division should have subpoenaed EG & G's source, verified the existence of the local dairy producer, and included local dairy analysis in the SRA. In

response, the Army argues that the Division surveyed local farming practices and did not locate anyone consuming locally produced milk.

■ We conclude that the Board acted within its sound discretion in rejecting Sierra Club's arguments concerning the omission of dairy products from the SRA. We note that Sierra Club presented no witnesses who engaged in, or knew of anyone who engaged in, dairy farming in TOCDF's vicinity. We therefore agree with the statement of the United States District Court for the District of Utah in rejecting a similar argument in an associated case: "Although ... the assumptions applied in the [SRA] may indicate a higher level of risk for some hypothetical persons, this does not constitute a showing that there is an actual risk to some person or persons posed by the emissions levels predicted for [TOCDF]." *Chemical Weapons Working Group*, 935 F.Supp. at 1214. Sierra Club failed to present to the Board any strong evidence that any local dairy producers existed.

While Sierra Club did not present evidence of local dairy production, the Board heard testimony that the Division could not find any individuals who were milking for 100% of their own consumption or for sale to neighbors; that some residents had milked in the past but were no longer doing so; that commercial dairy operations in the area were not feasible; and that the document which allegedly shows the Division knew of local dairy consumption was not prepared by the Division and was viewed by it as a "rough draft or a place to start as far as ... inquiry into the [local dairy] practices in Rush Valley."

Moreover, many of the same observations we made regarding infant dioxin risk also apply here, particularly the limited nexus between the short trial burn period and the SRA and the SRA's inherently conservative assumptions. In view of the foregoing, we

---

**3.** This is not to say, of course, that the actual and acceptable levels of infant dioxin exposure are not appropriate topics of future study by the Division before the Board approves full operations at TOCDF. In fact, a Division employee testified that the Division will do future assessments and update already-conducted assess-

ments as appropriate, thereby incorporating new data and any new EPA guidance. Thus, for instance, should the EPA arrive at a dioxin reference dose for infants, the Division would presumably incorporate the appropriate analysis in a risk assessment.

conclude that the Board did not err in rejecting Sierra Club's dairy consumption arguments.

### c. Open Burning/Open Detonation & Mustard Emissions

■ Sierra Club argues the Division failed to address in the SRA the effects of open burning/open detonation of chemical weapons and that the cumulative effect of open burning/open detonation and TOCDF emissions would exceed the State/EPA standard. We note that the Division has prohibited open burning/open detonation until a risk assessment modeling the risks of such activity is conducted and the risks are shown to be acceptable. Moreover, the Board heard testimony that if such an assessment indicated that the cumulative effect of open burning/open detonation and TOCDF emissions presented a risk, the Division would not permit open burning/open detonation while TOCDF is operating. The Board therefore clearly acted within its discretion in rejecting Sierra Club's argument because any risks associated with open burning/open detonation are not yet imminent.

Sierra Club also contends that the SRA is flawed because it fails to adequately address the effect of mustard gas emissions from the stack that ventilates the waste handling areas (HVAC stack). Specifically, Sierra Club contends that the Division arbitrarily lowered the estimated mustard emissions from the HVAC stack after that estimate showed a high risk from such emissions. As is the case with open burning/open detonation, the Executive Secretary has not yet approved mustard agent incineration. Consequently, the Board did not err in rejecting Sierra Club's arguments concerning these matters.

### OMISSION OF EG & G FROM PERMIT, ACCIDENTS AT TOCDF

Sierra Club contends that the Board erred in refusing to revoke EG & G's permit to operate TOCDF. Specifically, Sierra Club argues that the Board should have revoked EG & G's permit in light of EG & G's permitless operation of TOCDF for six months in violation of the Utah Solid and Hazardous Waste Act, specifically Utah Code Ann. § 19–6–108(3)(a) (Supp.1997),[4] and in light of alleged accidents at TOCDF while the facility was under EG & G's control. Sierra Club further asserts that the Executive Secretary erred in adding EG & G to the permit in June 1996. In response, the Board and intervenors contend that the Executive Secretary reasonably interpreted section 19–6–108(3)(a) in concluding that hazardous waste facilities frequently employ contractors and subcontractors and that EG & G's status as a contractor for the Army does not mean that EG & G was an "operator" within the statute's meaning. Therefore, they argue, EG & G did not need a permit and the Executive Secretary's later decision to add EG & G to the permit, though not legally required, was a reasonable exercise of his discretion.

### Standard of Review

■ Whether EG & G is an "operator" within the meaning of section 19–6–108(3)(a)—and therefore required to obtain a permit—is an issue of statutory construction. "We review the agency's statutory construction as a question of law under a correction-of-error standard unless the statute expressly or impliedly grants the agency discretion to interpret the statutory language." *Epperson v. Utah State Retirement Bd.,* 949 P.2d 779, 781 (Utah Ct.App.1997). *See O'Keefe v. Utah State Retirement Bd.,* 929 P.2d 1112, 1114 (Utah Ct.App.1996), *aff'd on other grounds,* 956 P.2d 279 (Utah 1998); *Allred v. Utah State Retirement Bd.,* 914 P.2d 1172, 1174 (Utah Ct.App.1996). In this case, the Solid and Hazardous Waste Act does not grant the Board such discretion, and therefore we review its decision for correctness. *See generally Epperson,* 949 P.2d at 781; *O'Keefe,* 929 P.2d at 1115. "Under the correction-of-error standard, this court affords no deference to the agency's interpretation or application of statutory terms." *Allred,* 914 P.2d at 1174.

---

**4.** As a convenience to the reader, and because the provisions in effect at the relevant times do not differ materially from the statutory provisions currently in effect, we cite to the most recent statutory codifications throughout this opinion, unless otherwise noted.

Whether the Board erred in refusing to revoke EG & G's permit in light of accidents and mishaps at TOCDF involves the Board's application of law to fact, *see Drake v. Industrial Comm'n*, 939 P.2d 177, 181 & n. 6 (Utah 1997); *State v. Pena*, 869 P.2d 932, 937–939 (Utah 1994), subject to the intermediate standard of review we discussed above. For essentially the same reasons as those previously discussed, we accord the Board a relatively high degree of deference in reviewing its application of law to the facts of this case.

### Analysis

The statute at issue provides: "No person may own, construct, modify, or operate any facility or site for the purpose of ... treating, storing, or disposing of hazardous waste without first submitting and receiving the approval of the executive secretary for a ... hazardous waste operation plan for that facility or site." Utah Code Ann. § 19–6–108(3)(a) (Supp.1997). *See also* Utah Admin. Code R315–3–1(a) (Supp.1997) ("No person shall own, construct, modify, or operate any facility for the purpose of treating, storing, or disposing of hazardous waste without first submitting, and receiving the approval of the Executive Secretary for, a hazardous waste operation plan for that facility."). Thus, the issue is relatively straight-forward: Did EG & G "operate" TOCDF within the statute's meaning? If so, section 19–6–108(3)(a) required EG & G to have a permit.[5]

"When interpreting statutes, [an appellate] court is guided by the long-standing rule that a statute should be construed according to its plain language. Thus, where the statutory language is plain and unambiguous, [the court] will not look beyond it to divine legislative intent." *Utah Sign, Inc. v. Utah Dep't of Transp.*, 896 P.2d 632, 633–34 (Utah 1995) (citations omitted). *Accord Brinkerhoff v. Forsyth*, 779 P.2d 685, 686 (Utah 1989); *Epperson*, 949 P.2d at 782. *See also Johnson v. Utah State Retirement Bd.*, 770 P.2d 93, 95 (Utah 1988) ("A fundamental principle of statutory construction is that unambiguous language in the statute itself may not be interpreted so as to contradict its plain meaning.").

Even though the Executive Secretary conceded that EG & G is an operator of TOCDF, and even though the intervenors refer in their brief to EG & G as an operator of TOCDF, the Board and the intervenors contend that EG & G is somehow not an operator within the statute's meaning because EG & G is a contractor hired by the Army. They further contend that the Army is the only party required to hold a permit because the Army bears "ultimate responsibility for construction and operation of the facility."

"[T]he terms of a statute should be interpreted in accord with their usual and accepted meanings." *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1045 (Utah 1991). *Accord Mt. Olympus Waters, Inc. v. Utah State Tax Comm'n*, 877 P.2d 1271, 1273 (Utah Ct.App.) (presuming statutory terms are used in their ordinary sense and should be interpreted according to usual and commonly accepted meanings), *cert. denied*, 890 P.2d 1034 (Utah 1994). Section 19–6–108(3)(a) uses the term "operate," which, as conceded by the Executive Secretary and the intervenors, encompasses the services EG & G performs at TOCDF. EG & G "operates" that facility under the common meaning of the term, regardless of whether it does so as a contractor, a partner, a joint venturer, or a volunteer. The Board and intervenors would have us construe "operate" to somehow exclude contractors hired by owners, even if they are hired—as is the case here—to "operate" the owner's facility. Such a construction does not accord with the plain meaning of the statute, nor with the "usual and accepted" meaning of the term "operate." If the Legislature intended that permits be obtained by only those "bearing ultimate responsibility for construction and operation" of hazardous waste facilities, as the intervenors assert, the statute would not require parties that "construct, modify, or operate" hazardous waste facilities to obtain a permit, in addition to those who "own" such facilities. It is inarguable, given the statute's plain

---

**5.** We follow the parties' lead in using "permit" synonymously with the statutory phrase "receiv-ing the approval of the executive secretary for a ... hazardous waste operation plan."

language, that EG & G violated section 19–6–108(3)(a) by operating TOCDF without a permit, and the Board erred in concluding that EG & G did not need a permit.

■ Sierra Club contends that because EG & G violated the Solid and Hazardous Waste Act by operating TOCDF without a permit, the Board should have sanctioned EG & G by refusing to add them to the permit. However, it appears that EG & G's omission from the permit was largely due to the Executive Secretary's erroneous interpretation of the term "operate," not to any connivance or evasion by EG & G. The fact that the Executive Secretary eventually added EG & G to the permit indicates that he came to realize the potential problem and took appropriate corrective action. Because the problem has been corrected, we cannot say the Board was unreasonable in declining to punish EG & G for not being named in the permit earlier by barring it from being included in the permit now.

■ As a second ground for seeking revocation of EG & G's permit, Sierra Club claims that a series of "mishaps, accidents, and violations"[6] at TOCDF show that EG & G cannot operate the facility in an acceptably safe manner. The Solid and Hazardous Waste Act provides that "[a]pproval of a ... hazardous waste operation plan *may* be revoked, in whole or in part, if the person to whom approval of the plan has been given fails to comply with that plan." Utah Code Ann. § 19–6–108(12) (Supp.1997) (emphasis added). Permit revocation is therefore a matter within the Board's discretion and is by no means mandatory. Here, while it found that accidents had occurred at TOCDF, the Board also found that the Army and EG & G took corrective steps after each mishap and that none of the incidents have recurred.

Sierra Club does not dispute that the Army and EG & G have taken such corrective measures. Moreover, these accidents occurred during what is known as the "shakedown" period—the central purpose of which is to "identify possible mechanical difficulties, ensure that [TOCDF] has reached operational readiness and achieve steady-state operating conditions prior to conducting the trial burns." One of the purposes of this phase of TOCDF operations is therefore to shake out possible bugs before the facility begins full-scale operations. Based on the foregoing, we cannot say that the Board abused its discretion or otherwise erred in refusing to revoke EG & G's permit due to these operational mishaps.

## DENIAL OF DUE PROCESS RIGHTS

In a prehearing order dated September 19, 1996, about six months before the hearing began, the Board ordered that Sierra Club would be given twelve hours to argue and conduct direct and cross-examination before the Board; EG & G and the Army would be limited to a collective total of ten hours; and the Executive Secretary would be limited to five hours.

Sierra Club argues that the Board violated its state and federal procedural Due Process rights[7] by unreasonably limiting its time to present its case and cross-examine adverse witnesses.[8] Intervenors and respondent contend that Sierra Club was afforded ample opportunity to present its case and to cross-examine witnesses, but that Sierra Club failed to efficiently use its allotted time and failed to exploit the available opportunities for otherwise getting evidence before the Board.

**6.** Specifically, Sierra Club alleges that an employee of an EG & G subcontractor provided falsified trial burn data; that nerve agent leaked into permeable vestibules outside the HVAC filters; that nerve agent decontamination solution leaked through an airlock; that fires have occurred in the liquid incinerator area; and that EG & G workers are inadequately trained.

**7.** Because "Utah's constitutional guarantee of due process is substantially the same as the due process guarantees contained in the Fifth and Fourteenth amendments to the United States Constitution," *In re Worthen,* 926 P.2d 853, 876 (Utah 1996), we need not undertake separate federal and state analysis.

**8.** During the hearing, Sierra Club also objected to the Board's decision to charge Board members' questions against the parties' allotted time.

## Standard of Review

"Questions regarding whether an administrative agency has afforded a petitioner due process in its hearings are questions of law. We therefore do not give deference to the agency's actions." *Lopez v. Career Serv. Review Bd.*, 834 P.2d 568, 571 (Utah Ct.App.), *cert. denied*, 843 P.2d 1042 (Utah 1992).

## Analysis

"The requirements of due process depend upon the specific context in which they are applied because 'unlike some legal rules due process is not a technical conception with a fixed content unrelated to time, place, and circumstances.'" *V-1 Oil Co. v. Department of Envtl. Quality*, 939 P.2d 1192, 1196 (Utah 1997) (quoting *Cafeteria Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). Due Process is therefore "flexible and requires such procedural protections as the particular situation demands." *Worrall v. Ogden City Fire Dep't*, 616 P.2d 598, 602 (Utah 1980).

■ We conclude that under the circumstances of this case, the Board did not deny Due Process to Sierra Club. The Utah Administrative Procedures Act (APA) provides that "[t]he presiding officer [of an administrative hearing] shall regulate the course of the hearing to obtain full disclosure of relevant facts and to afford all the parties reasonable opportunity to present their positions." Utah Code Ann. § 63-46b-8(1)(a) (1997). The APA further provides that "[t]he presiding officer shall afford to all parties the opportunity to present evidence, argue, respond, conduct cross-examination, and submit rebuttal evidence." *Id.* § 63-46b-8(1)(d).

While the Board's time limitations do appear somewhat parsimonious, under the APA the Board was entitled to regulate the course of the hearing, which necessarily included its duration. Here, the Board limited every party's time, with Sierra Club receiving the largest block of all. Sierra Club knew of the time limits far in advance of the actual hearing date yet failed to object until the hearing was well underway. The Board also offered the parties numerous opportunities to present their positions in forms other than through time-consuming testimony, i.e., pre- and post-hearing briefs, affidavits, deposition transcripts, transcripts from a companion case in federal court, and witness diaries.

Moreover, when it became apparent that Sierra Club had used the vast bulk of its time presenting its case and therefore had little time left for cross-examination of witnesses, the Board granted forty-five minutes of extra time to Sierra Club, and both the Army and the Executive Secretary ceded Sierra Club part of their allotted times. Finally, the Board permitted Sierra Club to take additional, unlogged time on cross-examination and voir dire of several witnesses. All told, Sierra Club used over fifteen hours by the end of the proceeding. The Executive Secretary used one hour and the Army and EG & G collectively used less than nine hours.

In support of its contention that, due to the time limits imposed by the Board, Sierra Club was denied its Due Process right to cross-examine adverse witnesses, Sierra Club primarily relies on two Utah cases where agencies violated the right to cross-examine witnesses. *See Tolman v. Salt Lake County Attorney*, 818 P.2d 23 (Utah Ct.App.1991); *D.B. v. Division of Occupational & Prof'l Licensing*, 779 P.2d 1145 (Utah Ct.App.1989). These cases are readily distinguishable from the one before us.

In *Tolman*, the petitioner argued that he was denied Due Process when the agency admitted highly prejudicial hearsay testimony, testimony which petitioner could not challenge without cross-examining the declarant, who did not testify. *See* 818 P.2d at 28–29. In *D.B.*, the administrative law judge refused to permit the petitioner to cross-examine *any* of the three witnesses presented against him. *See* 779 P.2d at 1147. We found denials of Due Process in both cases because these petitioners were denied *any* right to cross-examine the witnesses at issue. Such was not the case here.

In this case, the Board subjected Sierra Club to a time limit, not an outright denial of its right to cross-examine specific witnesses. "An administrative agency has broad discretion to reasonably regulate the time periods afforded parties to present evidence." *Clark*

*v. Board of Dirs.*, 915 S.W.2d 766, 773 (Mo. Ct.App.1996). *See also Childs v. Copper Valley Elec. Ass'n*, 860 P.2d 1184, 1190 (Alaska 1993) (stating review board "may place reasonable time limits on testimony in order to manage its own docket"). The fact that Sierra Club ran short on time does not mean it was denied its constitutional right to cross-examine witnesses, as occurred in *Tolman* and *D.B.* The right to Due Process in an agency hearing does not translate into an absolute right to take as much time in presenting its case as a participant desires.

A further distinction between this case and those cited by Sierra Club is that in both *Tolman* and *D.B.*, the petitioners showed they suffered substantial prejudice from these outright denials of the right to cross-examine. *D.B.*, 779 P.2d at 1149; *Tolman*, 818 P.2d at 30–31. Sierra Club does not make such a showing here. Aside from generally alleging that it lacked time to cross-examine several witnesses, Sierra Club does not state what evidence it needed to get in but did not, nor does it show that the case would have come out differently had it been given more time.

Moreover, it appears from the record that any shortfall in cross-examination time was partially due to Sierra Club's failure to budget its time. "'All parties [to an agency hearing] ... must be given *opportunity* to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal.'" *D.B.*, 779 P.2d at 1146 (emphasis added) (quoting *State Dep't of Community Affairs v. Utah Merit Sys. Council*, 614 P.2d 1259, 1262 (Utah 1980)). Here Sierra Club had the opportunity to cross-examine every witness—it merely failed to make the most of that opportunity through judicious use of its allotted time.

Based on the foregoing, we conclude that the Board's time limitations were not unreasonable and that Sierra Club was not denied its constitutional rights to Due Process.

## CONCLUSION

We first conclude that Sierra Club has standing to bring this appeal because the issues raised are matters of substantial public importance. Second, we conclude that the Board did not err in refusing to revoke the trial burn permit in the face of Sierra Club's allegations of hazards to human health and the environment. Third, we conclude that the Board erred in finding that EG & G was not an "operator" of TOCDF under Utah Code Ann. § 19–6–108(3)(a) (Supp.1997), but that the Board did not abuse its discretion in refusing to revoke EG & G's permit on that basis. Additionally, we conclude the Board acted within its discretion in refusing to revoke EG & G's permit based on the accidents which have occurred at TOCDF. Fourth, we conclude that Sierra Club was not denied its federal and state Due Process rights by the time limits imposed by the Board.

Accordingly, we decline to disturb the Board's order.

DAVIS, P.J., and WILKINS, Associate P.J., concur.